STATE of Missouri, Respondent,

v.

Michael A. TISIUS, Appellant.

No. SC 84036.

Supreme Court of Missouri,
En Banc.

Dec. 10, 2002.

Rehearing Denied Jan. 28, 2003.

Deborah B. Wafer, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for Respondent.

RONNIE L. WHITE, Judge.

## I.

Appellant Michael A. Tisius was convicted of two counts of first-degree murder, section 565.020.[1] He was sentenced to death for each murder. Because the death penalty was imposed, this Court has exclusive appellate jurisdiction pursuant to Mo. Const. art. V, sec. 3. The judgment of the trial court is affirmed.

## II.

■ The facts, which this Court reviews in the light most favorable to the verdict,[2] are as follows:

In early June of 2000, Appellant and Roy Vance were cellmates at the Randolph County Jail in Huntsville, Missouri. Appellant's sentence lasted thirty days, and Vance told Appellant he would be in jail for some fifty years. As such, Appellant and Vance discussed various schemes where Appellant would return to jail to help Vance escape. In one of those plans, Appellant was to return to the jail with a firearm, force the guards into a cell, and give the gun to Vance, who would then take charge and release all of the inmates.

The Randolph County Jail was a two-story brick building that had been converted from a house. The front door of the jail was kept locked, and the officers could remotely open the door when visitors rang a doorbell. Inside the front door was a small foyer, and to the right behind a counter was the dispatch area where the officers were stationed. A hall led from

---

1. All further statutory references are to RSMo 2000 unless indicated otherwise.

2. *State v. Cole,* 71 S.W.3d 163, 168 (Mo. banc 2002).

the dispatch area to the jail cells in the rear of the building.

Appellant was released on June 13, 2000. Shortly after his release, Appellant contacted Vance's girlfriend, Tracie Bulington, who said that she wanted to go through with the escape plan. Four days later, Bulington drove from Macon to Columbia with a woman named Heather Douglas to pick up Appellant and drive him back to Macon; Appellant and Bulington stayed at Douglas' home for four or five days. During the ride to Columbia, Douglas heard the two discuss various ways of breaking Vance out of jail, including the idea of locking the jailers in a cell. They told Douglas they were joking. Douglas testified that over the days to follow, she heard Appellant and Bulington say that they were "on a mission," but they would not elaborate. Appellant and Bulington also described taking cigarettes to Vance at the jail and of having gotten information from a "stupid deputy." At other times they would stop talking when Douglas entered the room. Douglas also testified that Appellant and Bulington kept a stereo, clothing and camping gear in Bulington's car and that she also saw a pistol in Bulington's car.

Beginning June 17, 2000, and continuing over several days, Appellant and Bulington visited the jail several times. At or around 1:30 a.m. or 2 a.m. one of those mornings, they were admitted in the front door and delivered a pack of cigarettes to an on-duty officer, requesting that it be given to Vance. A day or two later, Appellant and Bulington returned to the jail with a pair of socks for Vance and asked questions about his upcoming court date.

Bulington testified that each delivery signified to Vance certain facts, such as

that Appellant had made it to town or that the jail break would not occur the night of the delivery. During some of those visits, Appellant kept a .22 caliber pistol that Bulington had taken from her parents' home in the front of his pants. Appellant had tried to acquire a bigger gun than the one Bulington took. On the night of one of their visits, one officer testified that the Appellant and Bulington were acting "real funny," nervous and erratic, such that he wrote a police report about the visit.

Appellant tested the gun by firing it outside of Bulington's car window while the two were driving on country roads on June 21, 2000. Later that evening, Appellant and Bulington[3] drove around listening to a song with the refrain "mo murda" (more murder) as they prepared to get Vance out of jail. Appellant rewound the cassette and played the "mo murda" song over and over. Appellant told Bulington "it was getting about time" and that "he was going to go in and just start shooting and that he had to do what he had to do." Appellant also said he would go "in with a blaze of glory."

At 12:15 a.m. on June 22, Appellant and Bulington returned to the Randolph County Jail, rang the doorbell and were admitted. Appellant again carried the pistol in his pants. Appellant and Bulington told the officers they were delivering cigarettes to Vance. The two officers present were Leon Egley and Jason Acton. Appellant made small talk with one of the officers for about ten minutes, discussing what Appellant was planning to do with his life and how Appellant was doing. Bulington testified that at that point, she was about to tell Appellant she was ready to leave but froze as she noticed Appellant had the gun

---

3. Bulington testified in the penalty phase of the trial; her testimony therefore is not considered in Appellant's third point, *infra*, con-

testing the sufficiency of the convictions of first-degree murder.

drawn beside his leg. Appellant then raised his arm with the pistol drawn and, from a distance of two to four feet, shot Acton in the forehead above his left eye, killing him instantly. Egley began to approach Appellant, and about ten seconds after he killed Acton, Appellant shot Egley one or more times from a distance of four or five feet, until Egley fell to the ground. Both officers were unarmed.

Appellant then took some keys from the dispatch area and went to Vance's cell. Appellant could not open the cell, so he returned to the dispatch area to search for more keys. While Appellant was in the dispatch area, Egley grabbed Bulington's legs from where he was lying on the floor, and Appellant shot him several more times at a distance of two or three feet. Egley suffered five gunshot wounds, three to the forehead, a graze wound to the right cheek and a wound to the upper right shoulder. Not long afterwards, police found Egley gasping for air and a heard gurgling sound; he was surrounded by a pool of blood. Egley died shortly afterwards.

Appellant and Bulington fled in her automobile. Appellant threw the keys from the dispatch area out of the car window on the way out of town. Bulington threw the pistol from the car window while crossing a bridge on Highway 36. After the two had passed through St. Joseph and crossed the Kansas state line, Bulington's car broke down. Later that day, the two were apprehended by the police, and the keys and gun were recovered. After having waived his *Miranda* rights, Appellant gave oral and written confessions to the murders.

Appellant's theory at trial was that he was guilty at most of second-degree murder because although he admits that he

shot and killed the two officers, he argues that he did so without deliberation. Further facts are set forth below as necessary.

### III.

### A.

■ In his first point, Appellant argues that the trial court erred in overruling his objection to the introduction of a rap song with the refrain of "mo' murda" (more murder), which was played to the jury in the penalty phase. Bulington testified that she and Appellant were driving around in her car the night of the murders while Appellant listened over and over to that song by the rap group Bone, Thugs 'n Harmony. As noted above, while listening to the song over and over, Bulington testified that Appellant said "it was getting about time" and that he "was going to go in and just start shooting" and that he "had to do what he had to do." He also said he would "go in with a blaze of glory." The song was played to the jury, though the court sustained Appellant's objection to the State's offer of the song's written lyrics.

Appellant argues that the admission of the song violates his First and Fourteenth Amendment rights to listen to music of his choosing. In so arguing, Appellant cites *Dawson v. Delaware,*[4] in which the defendant's affiliation in the Aryan Brotherhood was presented at the punishment phase of his capital trial.[5] Dawson's conviction was reversed because the United States Supreme Court determined that his affiliation with the Aryan Brotherhood was *irrelevant* to the underlying case—the murder victim was white, as was Dawson, and racial hatred did not play a role in the

---

**4.** 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992).

**5.** *Id.* at 160, 112 S.Ct. 1093.

killing.[6] As such, the Court held that failing to connect Appellant's "abstract beliefs" with the issue being tried amounted to a First Amendment violation.[7] Appellant argues that similarly, the "mo murda" song was irrelevant to the underlying proceedings and in violation of his First and Fourteenth Amendment rights.

■ The general rule in Missouri is that evidence must be both logically and legally relevant in order to be admissible.[8] "Evidence is logically relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case."[9] The determination of legal relevance—the balancing of the probative value of the proffered evidence against its prejudicial effect on the jury—rests within the sound discretion of the trial court.[10]

■ The State's specific argument at trial was that Appellant used the tape to "psych" himself up for the "cold-blooded" murders.[11] The evidence here was logically relevant: it was introduced in the context of Bulington's testimony to show what Appellant was doing and saying immediately before the murders. Direct proof of a required mental state is seldom available, and the mental state may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the slaying.[12] The defendant's mental state may be determined from evidence of the defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct.[13] Here, before he shot two peace officers, Appel-

6. *Id.* at 166, 112 S.Ct. 1093.

7. *Id.* at 168, 112 S.Ct. 1093. Appellant cites several other cases, only one of which was truly grounded in the First Amendment: *State v. Nelson*, 155 N.J. 487, 715 A.2d 281 (1998)(defendant's obsession with guns, the Second Amendment and the idea of a "bloody revolution" were irrelevant and inadmissible to show defendant acted in accord with views on guns because the state failed to connect "abstract belief" about importance of Second Amendment to charged offenses); *State v. Cheeseboro*, 346 S.C. 526, 552 S.E.2d 300 (2001)(lyrics to rap song authored by defendant while in jail that made vague references to leaving no prints and bodies left in a pool of blood should not have been admitted because probative value substantially outweighed prejudicial impact; error was harmless given other properly admitted evidence); *State v. Mann*, 355 N.C. 294, 560 S.E.2d 776 (2002)(prosecutor's reference to defendant as "wanta be rap star" not reversible error because not designed to incite racial and cultural prejudices of jury but showed motive of obtaining money he stole from murder victim); *People of the Territory of Guam v. Shymanovitz*, 157 F.3d 1154 (9th Cir.1998)(gay pornography irrelevant in trial for criminal sexual conduct involving minors because evidence did not describe methods of committing offense charged and did not go to elements of crime); *State v. Hanson*, 46 Wash. App. 656, 731 P.2d 1140 (1987)(fictional writings authored by defendant inadmissible because irrelevant); *Flanagan v. State*, 109 Nev. 50, 846 P.2d 1053 (1993)(evidence of bad character established through membership in cult was irrelevant and violative of First Amendment's Free Exercise Clause).

8. *State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002).

9. *State v. Mathews*, 33 S.W.3d 658, 661 (Mo. App.2000).

10. *Id.*

11. The State's theory that Appellant used the song was to "psych" himself up for the murders began in its opening statement to the punishment phase and was a theme throughout that phase.

12. *State v. Johns*, 34 S.W.3d 93, 110 (Mo. banc 2000).

13. *State v. Smotherman*, 993 S.W.2d 525, 530 (Mo.App.1999).

lant spent approximately forty-five minutes listening to the same song about homicide over and over, and in conjunction stated that it was "getting about time," that he "had to do what he had to do" that he would just "start shooting" and go in "with a blaze of glory." The introduction of the song supports the State's arguments that the Appellant "psyched" himself up for the murders and that they were committed in cold blood. One of the statutory aggravating factors submitted and found by the jury [14] was that at least one of the murders was "vile, horrible or inhuman" in that it involved "depravity of mind." Under these facts, the preparation activities were logically relevant to the crime of murder and properly aided the State in arguing that the death sentence was appropriate.

As for the question of legal relevance, Appellant argues that the song unfairly prejudiced the jury and therefore counterbalanced any probative value. While it is true that the words "mo murda" could have been unpleasant to the jury, Appellant has not demonstrated prejudice that outweighs probative value. Appellant conceded in his brief that the "words pour out quickly" and even Bulington, who heard the song played the entire time she was in the car with Appellant, could not say what the song was about.[15] In light of the standard of review, balancing the probative value of the song against the prejudicial effect on the jury reveals that the trial court did not abuse its sound discretion in admitting the song.

In so holding, this Court reiterates that the song was not admitted to show that it caused Appellant to commit the crimes,

nor was it admitted to show that that Appellant merely advocated the message of the composition.[16] Rather, the song was played in the context of Bulington's testimony regarding what Appellant was doing and saying immediately before he killed the two officers: he listened to the song over and over as he drove around; while listening to the song, he said it was "getting about time" and that he would just "start shooting" and go in "with a blaze of glory"; he went into the jailhouse; he made small talk with one of the officers; he took the gun from his pants and raised it, shooting both officers; he tried to free Vance; he shot the second officer several more times; and he fled.

That factual scenario is inapposite to the cases cited by Appellant where typically reversal was warranted where the relevance of the admitted material was lacking, or more specifically, where Appellant's abstract beliefs were wrongly before the jury.[17] While it is possible that under some scenarios, playing a rap song during a trial could be violative of First Amendment principles or could be irrelevant and constitute reversible error, here, taken in context of Bulington's testimony and considering the temporal proximity of the repeated playing of the song to the murders, the music was admitted properly to show circumstantial evidence of Appellant's mental state and preparation for the murders. The trial judge did not abuse his sound discretion in admitting this evidence.

**B.**

■ In the same point, Appellant argues that the trial court abused its discre-

---

**14.** Review of the statutory aggravating factors is found under V.B., *infra.*

**15.** Bulington also testified that the group was popular and that the album sold a lot of copies.

**16.** *See Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

**17.** *See supra* note 7 and accompanying text.

tion in allowing the song to be played to the jury because Appellant did not have notice of the song, in violation of discovery rules. In a deposition a month or so before trial, Bulington testified that Appellant had listened over and over to a song by Bone, Thugs 'n Harmony and identified the album, but she could not identify the name of the song; rather, she could only testify that the chorus had "mo murda" in it. Before trial, Appellant's defense obtained a copy of the album and determined that the words "mo murda" appeared in two songs. The morning before the penalty phase began, the State played the album to Bulington, who was able to identify the song in question. Over an objection of "surprise," the song was played to the jury. On appeal, Appellant argues that the State violated its continuing duty of disclosure.

■■■ "The purpose of discovery is to permit defendant a decent opportunity to prepare in advance for trial and avoid surprise." [18] Thus, the focus of a denial of discovery is whether there is a reasonable likelihood that denial of discovery affected the outcome of the trial.[19] The standard for reviewing a claim that defendant was denied meaningful discovery is whether the trial court abused its discretion in such a way as to result in fundamental unfairness.[20] Fundamental unfairness occurs when the state's failure to disclose results in defendant's "genuine surprise" and the surprise prevents meaningful efforts to consider and prepare a strategy for addressing the evidence.[21]

■■■ In this case, although the State should have disclosed the song, Appellant has not shown a reasonable likelihood that the denial of knowing the specific song with the lyrics "mo murda" affected the outcome of the trial. Appellant did not state to the trial court precisely what he would have done differently to prepare for trial had he known the proper song had been identified. On appeal, Appellant states that he would have found "rap music experts" who could have testified that the group did not advocate violence. Bare assertions of prejudice are not sufficient to establish fundamental unfairness and does not show how the trial was substantially altered.[22] The trial court did not abuse its discretion.

## IV.

■■■ In his second point, Appellant argues that the trial court erred in sustaining the State's motion to strike venireperson Patti Lou Grant in the penalty phase. During the State's portion of the *voir dire*, Grant indicated that she could not impose the death penalty on anyone. The State asked several follow-up questions, and each time, Grant's responses indicated unequivocally that she could not impose the death penalty—that was her "final answer." Later, the defense attorney attempted to rehabilitate Grant and other similarly situated venirepersons by asking whether there were any circumstances under which they could impose the death penalty. This time, Grant indicated that she could impose the death penalty if the crime was "horrendous" or "terrible." The court sustained the State's request that Grant be stricken for cause.

---

18. *State v. Mease,* 842 S.W.2d 98, 108 (Mo. banc 1992).

19. *Id.*

20. *Id.*

21. *State v. Johnston,* 957 S.W.2d 734, 750 (Mo. banc 1997).

22. *State v. Thompson,* 985 S.W.2d 779, 785 (Mo. banc 1999).

"A trial court's ruling on a challenge for cause will be upheld on appeal unless it is clearly against the evidence and is a clear abuse of discretion."[23] In determining whether a potential juror should be excluded because of his or her view on capital punishment, the standard is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"[24] A venireperson cannot be excluded merely for stating general objections to the death penalty or expressing conscientious or religious scruples about its infliction.[25]

This Court finds no clear abuse of discretion in upholding the State's challenge for cause. Here, venireperson Grant testified first that she could never impose the death penalty; she later testified that maybe she could. "Where there is conflicting testimony regarding a prospective juror's ability to consider the death penalty, the trial court does not abuse its discretion by giving more weight to one response than to another and in finding that the venireperson could not properly consider the death penalty."[26] Grant's "final answer" where she stated she could never impose the death penalty did not reconcile with her responses to defense counsel's rehabilitative questions, nor was she asked to reconcile the differing answers.[27]

"The qualifications of a prospective juror are not determined conclusively by a single response, but are determined on the basis of the *voir dire* as a whole."[28] As noted above, the trial court is given broad discretion in determining the qualifications of a prospective juror because it is in the best position to evaluate the venireperson's commitment to follow the law.[29] In this case, because Grant equivocated on whether she could vote for the death penalty and considering the *voir dire* as a whole, the trial court's decision to sustain the State's strike for cause was not a clear abuse of discretion.

## V.

### A.

In his third point, Appellant argues that the evidence at trial was insufficient to establish beyond a reasonable doubt that he deliberated on killing the two officers. Appellant argues further that numerous errors in the admission and exclusion of evidence at the penalty phase, plus the lack of evidentiary support for the element of deliberation as well as mitigating evidence, undermine the confidence of the death verdict.

When considering the sufficiency of the evidence on appeal, this Court must determine whether sufficient evidence permits a reasonable juror to find guilt beyond a reasonable doubt.[30] The evidence and all reasonable inferences therefrom are viewed in the light most

23. *State v. Christeson,* 50 S.W.3d 251, 264 (Mo. banc 2001).

24. *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (citation omitted).

25. *State v. Rousan,* 961 S.W.2d 831, 839 (Mo. banc 1998)(quoting *Gray v. Mississippi,* 481 U.S. 648, 657, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987)).

26. *State v. Roberts,* 948 S.W.2d 577, 597 (Mo. banc 1997).

27. *See Christeson,* 50 S.W.3d at 265.

28. *Rousan,* 961 S.W.2d at 839.

29. *Id.*

30. *State v. Crawford,* 68 S.W.3d 406, 408 (Mo. banc 2002).

favorable to the verdict, disregarding any evidence and inferences contrary to the verdict.[31]

The crime of first degree murder consists of three elements: (1) knowingly (2) causing the death of another person (3) after deliberation upon the matter.[32] Section 565.002(3) defines the intent element of deliberation as "cool reflection for any length of time no matter how brief." The element of deliberation may be proven from the circumstances surrounding the crime.[33] Absent evidence of deliberation, an intentional killing is second-degree murder.[34]

In arguing the evidence was insufficient to convict him of first-degree murder, Appellant cites his confession and Bulington's testimony that the plan was merely to intimidate the jailers with the gun. Such argument was presented at trial and rationally rejected by the jury. Much of the State's argument to the jury on deliberation centered on Appellant's knowledge of how the jail works (especially late at night), the visits to Vance before the attempt to break him out, the action of test-firing the gun the day of the murders, the proximity of the murder weapon to the officers' heads, the number of shots fired, and the number of victims.

"Evidence of a prolonged struggle, multiple wounds, or repeated blows may . . . support an inference of deliberation."[35] Here, Appellant shot officer Egley a total of five times, three times in the head at close range, in two separate incidents. The multiple wounds and multiple victims help support the jury's inference of deliberation in this case.

In addition, Appellant's conduct after the murders can also support a finding of deliberation.[36] After having shot Officer Acton, Appellant took no note of his physical condition and instead turned his gun and immediately shot Officer Egley. After learning that Egley was conscious and did not die from the first round of shots, Appellant fired another round. On his way out of town, Appellant disposed of the murder weapon and the keys. Appellant's concerns were freeing his friend and escaping. Disposing of evidence and flight can support the inference of deliberation.[37]

While the jury was not compelled to find deliberation from the evidence,[38] the evidence was sufficient to support the jury's verdict that Appellant deliberated before committing two counts of first-degree murder.

### B.

Also under his third point, Appellant argues that numerous errors in the admission and exclusion of evidence at the penalty phase, plus the lack of evidentiary support of the element of deliberation and the substantial mitigating evidence, undermine the confidence in the reliability of the death verdict and require that it be vacated. All of these points are raised at other

31. *Cole,* 71 S.W.3d at 169.

32. *Johns,* 34 S.W.3d at 110.

33. *State v. Ferguson,* 20 S.W.3d 485, 497 (Mo. banc 2000).

34. *Cole,* 71 S.W.3d at 169.

35. *State v. Ervin,* 979 S.W.2d 149, 159 (Mo. banc 1998).

36. *See State v. Skillicorn* 944 S.W.2d 877, 887 (Mo. banc 1997); *see also State v. Moore,* 949 S.W.2d 629, 633 (Mo.App.1997).

37. *State v. Williams,* 945 S.W.2d 575, 580 (Mo.App.1997).

38. *State v. Johns,* 34 S.W.3d 93, 111 (Mo. banc 2000).

times in Appellant's brief,[39] yet Appellant seeks review anew on the ground that this Court should consider the factors he cites in evaluating the reliability and proportionality of the death verdict.

 This Court construes Appellant's argument to invoke this Court's duty under section 565.035.3 to conduct independent review of the proportionality of his death sentences. The purpose of the proportionality review is "merely to prevent freakish and wanton applications of the death penalty."[40] Such review was designed by the legislature as an additional safeguard against arbitrary and capricious sentencing and to promote evenhanded, rational and consistent imposition of death sentences.[41]

Section 565.035.3 requires this Court to determine:

(1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) whether the evidence supports the jury's finding of a statutory aggravating factor; and

(3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant.

As to the first factor, this Court has reviewed the record and concludes that there is no evidence to suggest that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. Appellant offers no compelling argument to the contrary.

As to the second factor, the record supports the jury's determination of the statutory aggravating factor that each victim was a peace officer engaged in the performance of his official duties under section 565.032.2(8). In addition, as to Egley, the jury found two additional statutory aggravating factors: that the murder was committed while Appellant was engaged in the murder of Acton under section 565.032.2(2); and that the murder was vile, horrible or inhuman in that it involved depravity of mind under section 565.032.2(7). The evidence supports the jury's findings that both officers were acting as peace officers, and that the murder of Egley, the second officer murdered, was committed while Appellant was engaged in the murder of Acton. The evidence also supports the jury's finding that the murder of Egley was vile, horrible or inhuman in that it involved depravity of mind— Egley was shot several times, at close range, in two separate incidents. During the second incident, Egley was fully conscious and aware that he and his co-worker had been shot.

This Court finds too that under the third factor, section 565.035.3, the death sentences in this case are neither excessive nor disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant. This Court has upheld sentences of death in cases where the defendant committed murder of peace offi-

---

39. Appellant rehashes his arguments about erroneous jury selection (Point II); irrelevant and prejudicial evidence of rap music (Point I); exclusion of a letter from a co-conspirator (Point VI); exclusion of a defense witness who would have rebutted the State's evidence that Appellant would be dangerous in the future (Point IX); exclusion of Appellant's mother's testimony that Appellant was remorseful (Point V).

40. *State v. Johnson,* 968 S.W.2d 123, 134 (Mo. banc 1998).

41. *State v. Brooks,* 960 S.W.2d 479, 502 (Mo. banc 1997).

cers.[42] The death sentence has also been found appropriate where the fatal blow is dealt to the victim while the victim is lying injured and helpless, which the facts indicate occurred in this case with Officer Egley.[43]

## VI.

■ In his fourth point, Appellant argues that the trial court erred in overruling his motion to quash the information and exceeded its jurisdiction in sentencing him to death because the information failed to plead any aggravating circumstances. He argues that the offenses actually charged against him were "unaggravated first degree murder" and thus that the trial court was without jurisdiction to sentence him to death. Appellant's argument is premised on the notion that the aggravating circumstances were additional elements of first-degree murder punishable by death and therefore the State violated *Apprendi v. New Jersey*[44] by not pleading aggravating circumstances in the original information.

Appellant's argument was broached and rejected earlier this year in *State v. Cole*.[45] Essentially, as argued in *Cole*, Appellant contends that Missouri's statutory scheme creates two kinds of first-degree murder. Section 565.020 establishes the crime of first-degree murder and the punishments set forth are life in prison or death; section 565.030 sets forth the trial procedure

for first-degree murder. Appellant argues that the "combined effect of sections 565.020 and 565.030.4" creates two types of first-degree murder. Appellant argues that one type is "unenhanced" or "simple" first-degree murder, established by proving a killing done knowingly and with deliberation; Appellant argues that the other is "aggravated" or "capital" first-degree murder, which requires proof beyond a reasonable doubt of an aggravating circumstance, and for which the punishment is life in prison or alternately death. Appellant contends that because the State failed to plead aggravating circumstances in the information, Appellant could only be charged and convicted of "unenhanced" or "simple" first-degree murder under *Apprendi* because there the United States Supreme Court held that "any fact . . . that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."[46]

■ As held in *Cole*, the two statutes Appellant cites serve different functions: section 565.020 defines the single offense of first-degree murder with the range of punishment including life imprisonment or death; section 565.030 merely delineates trial procedure. The Appellant's contention of a violation of *Apprendi* is without merit: pursuant to section 565.005.1, the State gave Appellant notice that it would seek the death penalty, and

**42.** *State v. Clayton*, 995 S.W.2d 468, 484 (Mo. banc 1999); *Johnson*, 968 S.W.2d at 135; *State v. Sweet*, 796 S.W.2d 607, 616–617 (Mo. banc 1990); *State v. Mallett*, 732 S.W.2d 527, 542 (Mo. banc 1987).

**43.** *Cole*, 71 S.W.3d at 177.

**44.** 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**45.** 71 S.W.3d at 171.

**46.** 530 U.S. at 476, 120 S.Ct. 2348 (citation omitted). The facts of *Apprendi* are inapposite: there, the defendant's sentence was increased twelve years by the trial judge, who decided that by a preponderance of the evidence, the State proved the underlying offenses also triggered New Jersey's "hate crime" statute. The "hate crime" statute, which provided for an enhanced sentence, was not pleaded in the indictment, was not submitted to a jury, and was not proven beyond a reasonable doubt.

the aggravating circumstances were proved to a jury beyond a reasonable doubt. "The maximum penalty for first-degree murder in Missouri is death, and the required presence of aggravating facts or circumstances to result in this sentence in no way increases this maximum penalty."[47]

## VII.

■■■■ Appellant argues in his fifth point that the trial court erred in sustaining the State's hearsay objection to punishment-phase testimony of Appellant's mother that Appellant told her after the arrests that he was "sorry." Such argument is not properly preserved because Appellant did not object on the grounds he now asserts on appeal.[48] Where a point is not properly preserved, plain-error review is discretionary when manifest injustice or miscarriage of justice has resulted.[49] A review of the record and argument indicate no such circumstances. An extended review of this issue would have no precedential value.[50]

## VIII.

■■■■ Appellant argues in his sixth point that the trial court erred in twice sustaining the State's objection to exclude a letter from co-defendant Roy Vance to "Karl."[51] The letter solicited a person named Karl, whose identity is unknown

and who therefore is not a part of the appeal, to assist Vance in breaking him out of jail. In part, the letter read:

I know what Tracie is talking about sounds crazy but if done right it could be really simple with at least an hour or two to get away. There's no button for help and the cameras don't record anything so they wouldn't even have a clue who did it. Under normal circumstances I would never ask but we're family, me you and Tracie and I need to be together as one....

Appellant's point is not properly preserved for two related reasons. First, Appellant did not make a proper offer of proof sufficiently stating the relevance of the proffered evidence. Second, his reasons asserted on appeal for why the letter was relevant were not presented to the trial court.

■■■■ An offer of proof must show three things: 1) what the evidence will be; 2) the purpose and object of the evidence; and 3) each fact essential to establishing the admissibility of the evidence.[52] Where proffered evidence is excluded, relevancy and materiality must be shown by specific facts sufficient to establish admissibility so as to preserve the matter for review.[53] The purposes of an offer of proof are: 1) to preserve the evidence so that the appellate court understands the scope and effect of the questions and proposed answers in

---

47. *Cole*, 71 S.W.3d at 171.

48. *State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998).

49. Rule 30.20.

50. Rule 30.25.

51. The first time the letter was offered was during the guilt stage. Appellant tried to introduce the letter through one of the officers who recovered it from Bulington's car. Because there was no foundation—the officer could not testify as to Vance's handwriting—

the court excluded the letter. The second time the letter was offered was during the penalty stage. Appellant tried to introduce the letter through Bulington, who testified that the handwriting "looks like Roy's." The court sustained the State's objections on relevance and hearsay grounds.

52. *State v. Hirt*, 16 S.W.3d 628, 633 (Mo.App. 2000).

53. *Id.*

considering whether the trial judge's ruling was proper; and 2) to allow the trial judge to further consider the claim of admissibility after having ruled the evidence inadmissible.[54]

■ Because this point was not properly preserved, this Court reviews for plain error. "To prevail on plain error review, [Appellant] must show that the trial court's error so substantially violated his rights that manifest injustice or a miscarriage of justice results if the error is not corrected."[55]

Appellant's first argument under this point is that the trial court erred in excluding this evidence because the key part of the letter, that the jury did not hear, was that the plan to break Vance out of jail would be really simple "if done right." That phrase supposedly supported Appellant's defense that there was no plan to kill the jailers and therefore no deliberation. That ground for admission was never presented to the trial court. Nevertheless, this Court finds no manifest injustice in excluding the letter because regardless of what Vance had in mind for the jail break, the question was whether Appellant deliberated, and that could have occurred independently and well after the letter was written.

Appellant's second reason for arguing that the letter should have been admitted was that the letter would have established that Vance and Bulington were the primary planners and that Appellant was merely following their plan. Again, this ground was not presented to the trial court and for the reasons set forth above, this argument must fail.

## IX.

■ In his seventh point, Appellant argues that the trial court erred in overruling his objection to jury instructions due to "duplicative" aggravating factors. Appellant concedes this argument was recently considered and rejected by this Court in *State v. Anderson.*[56] Moreover, the jury found a valid statutory aggravating factor for each officer in addition to those complained of in this appeal. A review of the argument on this point indicates no error, and an extended opinion would have no precedential value.[57]

## X.

In his eighth point, Appellant argues that the trial court erred in overruling his objection to cameras in the courtroom. Appellant's argument is grounded in the fact that although the trial judge entered an order authorizing cameras in the courtroom, he realized at trial that he had not notified either Appellant or the State pursuant to Supreme Court Operating Rule 16.03(b). In pertinent part, that provision states:

> Coverage. All requests by representatives of the news media to use photographic equipment, television cameras, or electronic sound recording equipment in the courtroom shall be made to the media coordinator in writing at least five days in advance of the scheduled proceeding. The media coordinator, in turn, shall give notice in writing of said request to counsel for all parties, parties appearing without counsel, and the judge at least four days in advance of the time the proceeding is scheduled to begin. In addition, the media coordina-

54. *State v. Bouser,* 17 S.W.3d 130, 141 (Mo. App.1999).

55. *State v. Clayton,* 995 S.W.2d 468, 478 (Mo. banc 1999).

56. 79 S.W.3d 420, 442 (Mo. banc 2002).

57. Rule 30.25.

tor shall file a copy of the notice with the clerk of the court in the county in which the proceeding is being held. These times may be extended or reduced by court order. When the proceeding is not scheduled at least five days in advance, however, the media coordinator shall give notice of the request as soon as practicable after the proceeding has been scheduled.

Because the judge realized he had not given notice of this rule, he gave both parties a chance to object on the record. The State made no objection. Relevant to the appeal, Appellant argued that the camera puts "undue pressure" on the jury to find Appellant guilty and sentence him to death. That objection was overruled. On appeal, Appellant argues that the presence of cameras violated his Fourteenth Amendment right to due process of law and that the absence of notice pursuant to Rule 16.03(b) entitled him to a new trial.

### A. No Due Process Violation

 "Electronic media coverage of criminal trials does not constitute a *per se* denial of due process." [58] Appellant "must produce evidence that the media coverage of his case 'had an adverse impact on the trial participants sufficient to constitute a denial of due process.'" [59]

In support of his argument alleging a denial of due process, Appellant cites two incidents. In the first incident, after calling Douglas to the witness stand, the State said in open court: "Your Honor, this witness has requested that she not be videotaped." Appellant sought a mistrial, stating that the prosecutor had brought the cameras to the attention of the jury. That

request was denied. In the second incident, while questioning a witness in the penalty phase, Appellant's attorney advised the judge at the bench that the witness was "very uncomfortable" being videotaped. The court responded, "Not now."

The U.S. Supreme Court has held:

A defendant has the right on review to show that the media's coverage of his case—printed or broadcast—compromised the ability of the jury to judge him fairly. Alternatively, a defendant might show that broadcast coverage of his particular case had an adverse impact on the trial participants sufficient to constitute a denial of due process. To demonstrate prejudice in a specific case a defendant must show something more than juror awareness that the trial is such as to attract the attention of broadcasters. [60]

In this case, the two incidents cited by Appellant do not rise to the level of a due process violation. The first incident was brief and does not indicate prolonged or substantial attention to the cameras. The second incident took place entirely at the bench. Appellant has not shown that the presence of the camera compromised the ability of the jury to render a fair verdict. As in an earlier case before this Court, Appellant's arguments amount to nothing more than "hopeful speculation." [61]

### B. No reversible error under Supreme Court Operating Rule 16.03(b)

 In his second argument under this point, Appellant argues that it was reversible error to not give him notice of cam-

---

**58.** *State v. Simmons*, 944 S.W.2d 165, 179 (Mo. banc 1997)(citing *Chandler v. Florida*, 449 U.S. 560, 574, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981)).

**59.** *Id.*

**60.** *Chandler*, 449 U.S. at 582, 101 S.Ct. 802.

**61.** *Simmons*, 944 S.W.2d at 179.

eras in the courtroom pursuant to Supreme Court Operating Rule 16.03(b). In support, Appellant points to language in the rule stating that the media coordinator "shall" give five days notice to the parties.

■ Although the rule states that notice "shall" be given to all parties, where a statute or rule does not state what results will follow in the event of a failure to comply with its terms, the rule or statute is directory and not mandatory.[62] In this case, although the term "shall" is used to direct the court to give notice of cameras in the courtroom, the rule does not make provisions in the event it is not complied with. In finding no reversible error, this Court has reviewed the Appellant's arguments, including those made on the record,[63] and determines that Appellant was not prejudiced.

### XI.

■ In his ninth point, Appellant argues that the trial court erred in sustaining the State's objections to punishment-phase testimony about whether Appellant would be a future danger to others if sentenced to life imprisonment. The flaw in Appellant's argument here is that Appellant withdrew his line of questioning; therefore, there was no objection for the judge to sustain.

Because this point was not properly preserved, this Court reviews the record for plain error.[64] "To prevail on plain error

review, [Appellant] must show that the trial court's error so substantially violated his rights that manifest injustice or a miscarriage of justice results if the error is not corrected."[65] A review of Appellant's argument and the record reveals no such error.

### XII.

■ In his final point, Appellant argues that the trial court erred in overruling his objection to the submission of Instruction No. 28 and 33 (MAI–CR3d 313.48A), the "verdict mechanics" instructions. Appellant argues that those penalty-phase instructions specifically reference consideration of aggravating circumstances when determining whether the penalty should be life in prison or death, but they do not specifically reference contemplating mitigating evidence during this consideration. Appellant contends this instruction does not comply with section 565.030.4(3) because it omits an essential "third step" directing the jury to weigh the mitigating circumstances—as compared to the aggravating circumstances—when determining the appropriate sentence.

Appellant concedes this argument was recently considered and denied by this Court.[66] He raises it only to preserve it for federal review. Finding no error of law, an extended opinion on these issues would have no precedential value.[67]

---

**62.** *Rundquist v. Director of Revenue,* 62 S.W.3d 643, 646 (Mo.App.2001). *See also Cline v. Carthage Crushed Limestone Co.,* 504 S.W.2d 118 (Mo.1974) (court rule requiring notice should be construed as directory and not mandatory) *and State ex rel. Currier v. Falkenhainer,* 283 Mo. 203, 223 S.W. 100 (1920) (same).

**63.** Appellant makes additional unpreserved allegations of prejudice: that he was unable to *voir dire* the jury on whether the cameras

would affect them and that he could not determine whether any of the witnesses did not wish to be videotaped.

**64.** Rule 30.20.

**65.** *State v. Clayton,* 995 S.W.2d 468, 478 (Mo. banc 1999).

**66.** *Cole,* 71 S.W.3d at 175–76.

**67.** Rule 30.25.

771

## XIII.

The judgment is affirmed.

All concur.