STATE OF HAWAI`I, Plaintiff-Appellee,
v.
RYRON L. PIA, Defendant-Appellant
No. 28666
Intermediate Court of Appeals of Hawaii.
November 21, 2008.
On the briefs:
Linda C.R. Jameson, for Defendant-Appellant.
Michael S. Kagami, Deputy Prosecuting Attorney, County of Hawai`i, for Plaintiff-Appellee.

SUMMARY DISPOSITION ORDER

NOT FOR PUBLICATION
RECKTENWALD, C.J., NAKAMURA and FUJISE, JJ.
Defendant-Appellant Ryron L. Pia appeals from the July 20, 2007 Judgment of Conviction and Sentence entered in the Circuit Court of the Third Circuit (circuit court)[1] convicting Pia of Attempted Murder in the First Degree in violation of Hawaii Revised Statutes (HRS) §§ 705-500(1)(b) (1993) and 707-701 (1993 and Supp. 2005), and Attempted Sexual Assault in the First Degree in violation of HRS §§ 705-500(1)(b) (1993) and 707-730(1)(a) (Supp. 2005), and sentencing him to life in prison without the possibility of parole.
The charges stemmed from an incident in the early morning of July 1, 2005 in which the complaining witness (CW) and her boyfriend (CW2) were stabbed in their house in Pahoa, Hawai`i. In brief summary, CW testified that she had been watching television in the house with CW2 and Pia, and that CW2 and Pia fell asleep. CW testified that she also fell asleep, and awoke to find that Pia was fondling her breast and trying to pull down her shorts; when she confronted him, he stabbed her twice in the neck. CW testified that Pia then ran towards CW2, and that she went into the kitchen and ran out of the house.
CW2 testified that he awoke to hear CW screaming, and that he was stabbed by someone when he went to see what was happening. The person followed him into the kitchen, and CW2 fell to the floor and kicked at the person for 20-30 seconds before running out of the house. Hawaii Police officer Daniel Rances testified that he responded to the scene and recovered a knife with what appeared to be blood on it outside the house. Hawai`i Police lieutenant Gregory Esteban testified that he observed that Pia had what appeared to be blood spots on the front portion of his shorts and on top of his feet.
Hawai`i Police sergeant Juergen Canda testified that on July 1, 2005, he took a statement from Pia in which Pia initially said that he had "blacked out" and did not recall the incident. Sergeant Canda testified that Pia subsequently acknowledged that he obtained the knife to compel CW to have sex with him, began to fondle CW, "somehow" stabbed CW when she tried to get up, and then stabbed CW2 when CW2 rushed at him. Pia gave a second statement to Sergeant Canda on July 2, 2005, in which he described the incident in more detail. Sergeant Canda testified that in this interview, Pia described the stabbings of CW and CW2 in a manner that suggested both stabbings were intentional rather than accidental.
In closing argument, Pia's counsel challenged a number of details of the State's case, including the reliability of CW and CW2's recollection of the incident and CW's identification of Pia as her assailant, and argued that Sergeant Canda had induced Pia to falsely confess.
Pia raises the following points of error on appeal:
(1) "The trial court committed plain error when it allowed into evidence the pictures of the knife, as well as the knife itself without a proper foundation and their admission violated [Pia's] constitutional right to confrontation under the Sixth Amendment of the U.S. Constitution and Article I, Sec. 14 of the Hawaii State Constitution";
(2) "The trial court abused its discretion when it allowed into evidence pictures of [CW's] underwear strewn about the living room where such evidence was irrelevant and prejudicial";
(3) "[Pia] was deprived of his constitutional right to effective assistance of counsel" in the following ways:
(a) "Counsel failed to call [CW2's] grandmother as an alibi witness";[2]
(b) "Counsel failed to request and/or produce an evaluation of [Pia's] level of intelligence or I.Q. after presenting evidence that [Pia] was slow and had difficulty understanding things";
(c) "Counsel failed to object to the hearsay testimony of Off[icer] Rances who related that [CW2's brother] told him that he saw [Pia] throw the knife down at the stairwell"; and
(d) "[C]ounsel failed to object to testimony that [Pia] listened to heavy rap metal music on the grounds that such evidence was not only irrelevant but even more importantly prejudicial, because the music talked about `killing people.'"
Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised, we resolve Pia's points of error as follows:
(1) The circuit court did not err when it admitted into evidence the photographs of the knife as well as the knife itself, since there was sufficient admissible evidence establishing the foundation for their admission.
Officer Rances testified that he recovered the knife outside CW and CW2's house in the early morning of July 1, 2005 and that the photographs of the knife accurately depicted the condition of the knife before he recovered it. Officer Rances also testified that there appeared to be fresh blood on the knife when he recovered it. CW identified the knife as the one that had been used to stab her and CW2. Sergeant Canda testified that Pia admitted to stabbing both CW and CW2, and that Pia told him that he "discarded the knife in the driveway near the dog house." Officer Rances testified that he recovered the knife "just onto the right of the dog house." Based on this evidence, there was sufficient foundation to admit the knife and photographs into evidence.
We agree with Pia that the court erred in admitting testimony by Officer Rances regarding a hearsay statement made to Officer Rances by CW2's brother about Pia discarding the knife. However, in light of the other evidence establishing the foundation for the admission of the knife and the photographs of it, that error was harmless beyond a reasonable doubt. See State v. Heard, 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) ("Even were we to assume that the court erred in admitting hearsay testimony, the error is not to be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.").
(2) The circuit court did not abuse its discretion when it admitted into evidence the photographs of CW's underwear strewn about the room. State v. Edwards, 81 Hawai`i 293, 297, 916 P.2d 703, 707 (1996) ("The admission or rejection of photographs is a matter within the discretion of the trial court; consequently, unless there is a showing of an abuse of discretion, the trial court's ruling will not be disturbed on appeal.").
The photographs were relevant to establish that Pia intentionally engaged in conduct that constituted a substantial step in a course of conduct intended to culminate in his commission of sexual assault in the first degree against CW, HRS § 705-500(1)(b)(1993), since the photographs support the inference that Pia had a sexual interest in CW and/or harbored some hostility toward her. Also, the photographs corroborate the statements made by Pia to Sergeant Canda during his second interview on July 2, 2005. Sergeant Canda testified that at the beginning of Pia's first interview, Pia indicated that he "blacked out," couldn't remember much about the incident, and denied having any knowledge about the underwear. Sergeant Canda testified that in his second interview, however, Pia admitted that prior to assaulting CW he had gone into her room, obtained a quantity of her underwear, and threw them around. Thus, the photographs tend to corroborate Pia's subsequent inculpatory statement, and rebut Pia's initial statement that he "blacked out" and was unable to remember anything about the incident in question.
Finally, the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. Hawaii Rules of Evidence Rule 403. Neither the photographs themselves, nor the inference that Pia had tossed the CW's underwear around the room, were likely to unduly inflame the passions of the jury or prejudice them against him.
(3) Pia's ineffective assistance of counsel claims are resolved as follows:
(a) On the record before us, Pia has failed to establish that his trial counsel's failure to call CW2's grandmother as an alibi witness constituted ineffective assistance of counsel. In order to establish that his trial counsel was ineffective, Pia must demonstrate: (1) "specific errors or omissions of defense counsel reflecting counsel's lack of skill, judgment or diligence," and (2) "that these errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." State v. Antone, 62 Haw. 346, 348-49, 615 P.2d 101, 104 (1980).
In support of his claim, Pia points to trial testimony by Pia's father about comments made to him by CW2's grandmother after the incident. However, the comments are ambiguous because they do not identify the time frame when Pia was with CW2's grandmother.[3] Moreover, Pia has not provided an affidavit or sworn statement from CW2's grandmother in support of his alibi defense. State v. Richie, 88 Hawai`i 19, 39, 960 P.2d 1227, 1247 (1998) ("[i]neffective assistance of counsel claims based on the failure to obtain witnesses must be supported by affidavits or sworn statements describing the testimony of the proffered witnesses"). In the absence of such an affidavit or sworn statement showing that CW2's grandmother would offer testimony establishing an alibi defense, we cannot conclude that Pia's trial counsel was ineffective.
(b) Pia has failed to establish that trial counsel was constitutionally ineffective for failing to request or produce an evaluation of Pia's level of intelligence or I.Q., and Pia's "suggestibility" to being "coaxed" into confessing.[4] Pia bases this claim on testimony by his father that Pia "had a hard time . . . understanding things" when Pia was growing up, and that Pia's father had to tell him things repeatedly.
However, Pia's father also testified that Pia graduated from high school with a certificate, and that Pia was married and had three children. Moreover, Pia's opening brief acknowledges that "[a] pretrial evaluation was conducted . . . and [Pia] was found fit to proceed and was found not to be substantially impaired at the time of the incident." Dr. John M. Compton, a member of the three-member panel appointed to examine Pia, described Pia's general intelligence as follows: "Cognitive abilities as suggested by [Pia's] use of language appear to be generally within the average range. His strong disinterest and dislike of school might suggest lower average abilities, but he clearly appears to have abilities within the normal range." Dr. Henry H. Yang, another member of the three-member panel appointed to examine Pia, described Pia's cognition as "Grossly intact."
Pia does not provide an affidavit or sworn statement establishing the substance of the expert testimony that he claims trial counsel should have presented. State v. Fukusaku, 85 Hawai`i 462, 481, 946 P.2d 32, 51 (1997). In the absence of such an affidavit or sworn statement, and given the other information in the record, Pia has failed to establish that his trial counsel was ineffective.
(c) Pia's claims that he was denied his right to effective assistance of counsel because trial counsel failed to (i) object to Officer Rances's hearsay testimony about a statement made by CW2's brother connecting Pia with the knife, and (ii) object to the admission into evidence of the knife, as well as photographs of the knife, are without merit.
Although Pia's trial counsel should have objected to the alleged hearsay testimony, his failure to do so did not result in the "withdrawal or substantial impairment of a potentially meritorious defense" given the other evidence linking Pia to the knife. Antone, 62 Haw. at 348-349, 615 P.2d at 104.
With regard to claim (c)(ii), trial counsel did object to the admission of the knife. The day before closing arguments, trial counsel moved to strike the knife. Specifically, trial counsel argued that the knife in evidence "[had] not been shown to be a knife that was used in this or a weapon that was in any way involved. The . . . witness that was able to or possibly able to connect it up . . . with the defendant did not come and did not testify." The circuit court denied the motion to strike on the ground that there was sufficient evidence to support the admission of the knife.
Although trial counsel did not object to the admission of photographs of the knife, we cannot say that his failure to do so was constitutionally ineffective since, as we discuss above, there was sufficient foundational evidence to support the admission of the photographs.
(d) Although we agree with Pia that his trial counsel should have objected to testimony about Pia listening to music that contained references to killing people, the failure to do so did not result in the "withdrawal or substantial impairment of a potentially meritorious defense." Id.
In the context of this case, the testimony about Pia's musical taste was irrelevant, or, to the extent it had any relevance, its probative value was outweighed by the risk of undue prejudice. See Scherrer v. State, 742 S.W.2d 877, 882 (Ark. 1988) (holding that evidence that defendant watched sex and horror movies was irrelevant in first degree murder case, but error did not warrant reversal as prejudicial effect was minimal and evidence of guilt was overwhelming); Houser v. State, 823 N.E.2d 693, 697 n.7 (Ind. 2005) (noting that as a general proposition there is not a correlation between an individual's enjoyment of a particular piece of music and the individual's behavior because "[s]uch a proposition would presuppose that individuals who enjoy listening to Charles Gounod's operatic version of Faust are more likely to engage in the worship of Satan"); cf. State v. Tisius, 92 S.W.3d 751, 760-761 (Mo. 2002) (evidence of rap song with refrain "mo' murda" played to jury in penalty phase of capital murder trial was relevant to show that before defendant shot two peace officers he listened to the song over and over and "stated that it was `getting about time,' that he `had to do what he had to do' that he would just `start shooting' and go in `with a blaze of glory[,]'" which supported the State's argument that defendant "'psyched' himself up for the murders and that they were committed in cold blood"); Bryant v. State, 802 N.E.2d 486, 498 (Ind. Ct. App. 2004) (rap song lyrics defendant composed, referring to placing a body in the trunk of a car, were relevant to contested issue of defendant's intent because they showed he had a hostile and violent attitude toward victim).
However, given the strong evidence of Pia's guilt  including CW's identification of Pia as her assailant, as well as Pia's statements to Sergeant Canda  we cannot conclude that trial counsel's failure to object "resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." See State v. Edwards, 81 Hawai`i 293, 300-301, 916 P.2d 703, 710-711 (1996) (although defense counsel's failure to object to testimony implying that defendant had a criminal record reflected a lack of skill, judgment, or diligence, given the overwhelming evidence linking the defendant to the crimes charged, this failure did not result in a withdrawal or substantial impairment of a potentially meritorious defense). Accordingly, this ineffective assistance of counsel claim fails.
Therefore,
IT IS HEREBY ORDERED that the July 20, 2007 Judgment of Conviction and Sentence entered in the Circuit Court of the Third Circuit is hereby affirmed.
NOTES
[1] The Honorable Greg K. Nakamura presided.
[2] Pia's opening brief, as well as the State's answering brief, identify this individual as Pia's grandmother. However, it appears from the trial transcripts that this is an error, and that the reference should be to CW2's grandmother. For the purposes of this order, we will refer to the individual as CW2's grandmother.
[3] Pia's father testified that about 10-15 minutes after CW and CW2 came to his house and he observed a puncture wound in CW2's chest, Pia's father went across the street and found Pia and CW2's grandmother standing outside. Pia's father then testified as follows:

[Defense counsel]: Okay. And what were [Pia and CW2's grandmother] doing?
[Pia's father]: Just standing and asking what happened. They was  they was outside. They heard the noise  she heard the noise and all that so she asked, "What happened?"
I said, "I don't know. Somebody get stabbed." Then, um, I told her that they said [Pia], but then she said,
"No. He was right here with me."
[4] The circuit court determined that the statements Pia made to Sergeant Canda on July 1, 2005 and July 2, 2005 were voluntary, a conclusion which Pia does not challenge in this appeal.