Lisa White Hardwick, Judge
Timothy McWilliams appeals from the circuit court's judgment after a jury convicted him of child molestation in the first degree. McWilliams contends that the circuit court abused its discretion by: (1) admitting particularized expert testimony, which improperly bolstered the victim's credibility; (2) prohibiting McWilliams from questioning witnesses about allegations that the victim had been coached in providing statements regarding the alleged sexual abuse; and (3) admitting a photograph in which McWilliams's horn tattoos were visible. For reasons explained herein, we reverse the conviction and remand for a new trial.
FACTUAL AND PROCEDURAL HISTORY
Around August 2014, six-year-old A.M.'s father was incarcerated, forcing A.M.'s mother ("Mother") to find a new residence. Mother and A.M. moved into the home of McWilliams, whom Mother referred to as a stepbrother, located in Columbia, Missouri. McWilliams provided both Mother and A.M. a room of their own in his three-bedroom, one-bathroom home. Despite having her own room, A.M. preferred to sleep with Mother.
*622 Around November 2014, Mother began dating Christopher.[1] Christopher worked at a local Walmart but lived in nearby Ashland, Missouri. Mother frequently visited Christopher at work to bring him a meal or visit during his breaks. A.M. would usually join Mother on these trips. Due to Christopher's work schedule, he would stay with Mother on occasion. When Christopher spent the night at McWilliams's home, A.M. would sleep on the floor in Mother's room.
Shortly after she moved into McWilliams's home, Mother began to notice that holes had appeared in the wall between A.M.'s room and the adjacent bathroom. Mother placed cotton balls into the holes and, after the cotton balls were removed for the first time, she placed another set of cotton balls into those holes. A short time later, Mother noticed another hole, this time in the wall separating her bedroom and McWilliams's closet. Mother stated she did not speak to McWilliams about this hole because she was concerned that he would kick them out of his house if she confronted him about it.
On December 22 or 23, 2014, Mother made a trip to Walmart to see Christopher, while A.M. stayed at home with McWilliams. Mother stated that she was absent for no more than thirty minutes as Christopher cut his break short to return home with Mother. When Mother left, A.M. was wearing pants, but Mother noticed upon her return to McWilliams's home that A.M. had changed into shorts. A.M. told her mother that she had changed because she was playing with McWilliams and got hot.
On the way to visit Christopher at work the next day, Mother told A.M. that she had a "super best friend secret" to tell her-that they were going to be moving out of McWilliams's home to live with Christopher at some point in the near future. Mother said she wanted to move "mainly because of the holes in the walls and stuff." Mother stated that she also wanted A.M. to keep the move a secret from McWilliams and A.M.'s father.
After Mother told A.M. her secret, A.M. told Mother that she, too, had a secret. A.M. told Mother that McWilliams had touched her. When Mother asked A.M. where she was touched, A.M. "pointed to her crotch, her vaginal area." Mother testified that A.M. said that the touching occurred with a broken vibrating toothbrush. Mother stated that she did not call the police because she "was just kind of shocked and not knowing what to do with, you know, the whole situation." Instead, Mother called her mother, grandmother, and Christopher.
Mother took A.M. to her mother's home and then returned to McWilliams's home. She continued to live in McWilliams's home and reported that she returned "[b]ecause that's where all my stuff was and that's where I was staying, so, I mean, I didn't have nowhere else really to go." She said nothing to McWilliams about the incident.
A.M. never again spent a night at McWilliams's home, but she returned with Mother on December 24 to "pick up some things." Although Mother believed McWilliams would be at his employer's house for a Christmas dinner, McWilliams returned while Mother and A.M. were gathering items. McWilliams asked if A.M. could join him for Christmas dinner, but Mother declined and McWilliams left.
While they were at the home, A.M. asked Mother for tape to hang a letter she *623 had written to McWilliams on his door. The letter read, "Dear [McWilliams], I hope you don't touch me again." Mother took the letter and brought it to police on December 29, 2014. On the same day, after speaking with Mother about the allegations, Detective Anthony Perkins conducted a cursory interview of A.M. Det. Perkins then assisted Mother in the scheduling of a forensic interview with Jerri Sites for the following day. On December 30, 2014, A.M. was interviewed by Sites.
Det. Perkins obtained a search warrant for McWilliams's home, which he and other officers executed on December 31, 2014. Upon arrival at the home, Det. Perkins spoke with McWilliams, who asked the officers why they were there. Det. Perkins responded, "you know what it's about[,]" to which McWilliams replied "No, I don't really know what it's about. There hasn't haven't [sic] [been] any children here within two-the last two weeks."
Det. Cody Bounds assisted in the execution of the search warrant on McWilliams's home. During the search, Det. Bounds observed the hole in McWilliams's closet, through which the detective could observe Mother's bedroom.
In January 2015, Mother moved out of McWilliams's home. Mother testified that, during the move, she entered McWilliams's bedroom to see if he had any of her belongings and stumbled upon an electric toothbrush she thought matched the description given by A.M.[2] Several days later, Mother brought the toothbrush to officers.
McWilliams was arrested and charged with one count of child molestation in the first degree. Prior to trial, McWilliams filed a motion in limine to exclude any evidence concerning another child's accusations. McWilliams's motion was sustained by consent of the State, because the State failed to file the proper notice under Missouri Constitution Article 1, § 18(c). In the pretrial 491 hearing, Mother testified that one of her step-nieces, Jane Doe,[3] had also accused McWilliams of sexual abuse. She further testified that she had never spoken with A.M. about Doe's allegations.
After three days of evidence and argument, the jury found McWilliams guilty of child molestation in the first degree and recommended an eight year prison sentence. On April 20, 2017, the circuit court sentenced McWilliams to eight years in the Missouri Department of Corrections. This appeal follows.
STANDARD OF REVIEW
The circuit court is vested with broad discretion in determining the admissibility of evidence. State v. Rogers , 529 S.W.3d 906, 910 (Mo. App. 2017). We review its rulings on the admission of evidence for an abuse of that discretion. State v. Taylor , 298 S.W.3d 482, 491 (Mo. banc 2009). An abuse of discretion occurs "when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." State v. Kemp , 212 S.W.3d 135, 145 (Mo. banc 2007). For an evidentiary error to warrant reversal, McWilliams must also demonstrate prejudice. State v. Reed , 282 S.W.3d 835, 837 (Mo. banc 2009).
ANALYSIS
POINT I
In Point I, McWilliams asserts that the circuit court erred in allowing the State to *624 question the expert witness, Jerri Sites, about A.M.'s ability to give idiosyncratic detail and the ages at which children are most likely to be susceptible to coaching and to lie. McWilliams contends the expert's responses to these questions invaded the province of the jury and improperly bolstered A.M.'s credibility.
A. Preservation of claims
As a threshold matter, the State contends that McWilliams failed to preserve this point on appeal because he: (1) abandoned his claim by failing to sufficiently cite to the objectionable testimony in his point on appeal; and (2) failed to make a timely objection and motion to strike at trial.
In support of its first assertion, the State relies on State v. Nunley , in which the Supreme Court of Missouri stated: "Arguments raised in the points relied on portion of an appellate brief that are not supported in the argument portion of the brief are deemed abandoned and preserve nothing for appellate review." 341 S.W.3d 611, 623 (Mo. banc 2011). In Nunley , the appellant cited to several sections of the Missouri Constitution, but provided no argument as to why those specific sections or the rights provided by them were violated. Id. at 622-23. It was the absence of any argument that led to the court's finding that Nunley failed to preserve his claim. Id. Unlike Nunley , McWilliams has provided both the factual basis for his claim and the legal reasons for which his claim should be considered for reversible error. Therefore, on this basis, McWilliams has complied with Rule 84.04 and properly preserved his claim for appellate review.
In its second argument, the State contends that McWilliams failed to properly preserve his first point on appeal because he failed to make a timely objection and motion to strike. In support of this second assertion, the State argues that McWilliams has failed to point to any specific testimony, but the State directs our attention to two specific instances of McWilliams's alleged failure to lodge a timely objection. The first is presented in a footnote, in which the State argues that McWilliams did not object to testimony concerning A.M.'s ability to give idiosyncratic detail about the event underlying the charge against McWilliams. In his brief, McWilliams alleges that this testimony was given over his objection. However, both parties provide an incomplete picture concerning this testimony.
Prior to the presentation of evidence, McWilliams made ten motions in limine, seeking to prevent the State from presenting a wide array of testimony. For the purposes of the first point on appeal, three are relevant. In his eighth, ninth, and tenth motions in limine, McWilliams asserted, respectively, that Sites's testimony presented potential issues concerning improper opinion testimony about A.M.'s credibility, improper bolstering of A.M.'s testimony, and cumulative presentation of hearsay statements. McWilliams sought orders preventing the State from adducing any testimony that would result in these harms. The circuit court denied motions nine and ten, but, with the State's agreement, granted motion in limine number eight concerning opinion testimony about A.M.'s credibility.
At trial, the State attempted to admit State's Exhibit 1 into evidence, which was a DVD containing a copy of Sites's interview of A.M. McWilliams objected to its admission, citing his ninth and tenth motions in limine concerning improper bolstering and cumulative hearsay testimony and McWilliams's Confrontation Clause rights. After a lengthy bench conference, the circuit court overruled the objections *625 but granted McWilliams's request for a continuing objection on those grounds.
Five questions later, the State asked Sites to comment on "some of [the] factors that [she] looks to based on [her] training and experience with regard to assessing a child's interview[.]" During her answer to this question, Sites spoke of idiosyncratic detail, which she defined as a gesture or sound that accompanies the child's speaking that is indicative of the child's re-enacting of the event in question. Sites then gave several examples of A.M. engaging in idiosyncratic detail during the interview. The State then asked Sites, "And what is the significance of a child having that idiosyncratic detail in their disclosure when you're assessing the interview?"
This question drew an objection from McWilliams on the ground that Sites was not qualified to give such testimony. The court overruled the objection before expressing its concern that this question was calculated to elicit testimony demonstrating A.M.'s credibility. McWilliams shared this concern. In response, the State asserted: "I don't believe she's going to use-say that this shows that the-that the child is credible. It's just-it will go towards assessing how the interview is going and her ability to understand and the reliability of the information that's being obtained." On those grounds, the court stated it would "allow that question at this point."
Immediately following this bench conference, the State asked, "If I did remember the question, with regard to, based on your training and experience, a child being able to provide idiosyncratic detail, what significance does that have as a forensic interviewer just in assessing the reliability of that-the way that interview-." Before the State could finish the question, McWilliams objected, asserting that this question was designed to have Sites comment on A.M.'s credibility because "credibility" and "reliability" are interchangeable. The State, again, argued that this question concerned the reliability of the interview process not the reliability of A.M.'s testimony. The court overruled McWilliams's objection but granted a continuing objection.
"To preserve an evidentiary question for appeal, counsel must make an objection at the time the evidence is sought to be introduced and the same objection must be carried forward on appeal." State v. Irby , 254 S.W.3d 181, 189 (Mo. App. 2008). The purpose of this requirement is to provide the circuit court with "the reasons [for] the objection so that it can thereby make a reasoned and informed ruling." State v. Hoy , 219 S.W.3d 796, 809 (Mo. App. 2007). McWilliams had a continuing objection based on improper bolstering, cumulative hearsay testimony, and the Confrontation Clause, but he did not make his objection concerning improper opinion testimony about A.M.'s credibility until after Sites had already provided some examples of A.M.'s ability to give idiosyncratic detail. An objection to the admissibility of evidence must be specific. Id.
With this context, it becomes clear that the question before us is whether McWilliams needed to object during that initial testimony to preserve this issue for appeal. McWilliams's point on appeal argues that this testimony concerning idiosyncratic detail was used to improperly bolster A.M.'s credibility. The State argues that McWilliams's failure to object to the first question in this long line of testimony precludes him from arguing that this point was preserved for appeal. The State's argument, however, misunderstands the issue at the heart of McWilliams's objection. While Sites's testimony concerning incidences of idiosyncratic detail can present, in and of itself, expert testimony concerns, McWilliams's objection and point on appeal *626 is concerned with the testimony once Sites was asked to comment on how the existence of such detail affects the reliability of the interview. McWilliams asserted at trial and in this appeal that this testimony was calculated to actually allow Sites to comment on A.M.'s credibility. Therefore, his objection prior to an answer on that line of questioning properly preserves his first point for appeal.[4]
Similarly, the State argues that a later objection concerning A.M.'s suggestibility was not preserved due to McWilliams's failure to pair his objection with a motion to strike. However, McWilliams was granted a continuing objection after his first objection to Sites's testimony concerning McWilliams's credibility argument, which he renewed several times throughout Site's testimony.[5]
This continuing objection occurred prior to any testimony or objection the State is now arguing we should find untimely. McWilliams presented these objections in his motion for new trial, and nothing in the record supports the State's contention that these objections were untimely. Therefore, on this basis, McWilliams has properly preserved his claim for appeal. We will review this point under the abuse of discretion standard.
B. Admissibility of Expert Testimony
The State called Sites to testify as an expert witness on the general profile of victims of sexual abuse. McWilliams alleges that the court erred in allowing her testimony concerning A.M.'s ability to give idiosyncratic detail and A.M.'s lack of suggestibility. "[E]xpert opinion testimony 'should never be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts proved.' " State v. Taylor , 663 S.W.2d 235, 239 (Mo. banc 1984) (quoting Sampson v. Missouri Pac. R.R. Co. , 560 S.W.2d 573, 586 (Mo. banc 1978) ). While an expert may testify to her opinion on an ultimate issue in a criminal proceeding, there are limits to that testimony, including that an expert cannot testify as to her opinion of a witness's credibility. State v. Ellis , 512 S.W.3d 816, 836 (Mo. App. 2016).
In cases where the sexual abuse of a child is at issue, there are two types of testimony that are typically at the forefront of a challenge against an expert witness-generalized and particular. Id. The Supreme Court of Missouri described the distinction between these two types of evidence in Churchill , stating:
General testimony describes a "generalization" of behaviors and other characteristics commonly found in those who have been the victims of sexual abuse. Particularized testimony is that testimony concerning a specific victim's credibility *627 as to whether they have been abused. The trial court has broad discretion in admitting general testimony, but when particularized testimony is offered, it must be rejected because it usurps the decision-making function of the jury and, therefore, is inadmissible.
State v. Churchill , 98 S.W.3d 536, 539 (Mo. banc 2003). Here, McWilliams complains about two aspects of Sites's trial testimony: (1) Sites's testimony concerning the significance of A.M.'s ability to give idiosyncratic detail; and (2) Sites's testimony concerning A.M.'s lack of suggestibility.
At the heart of McWilliams's first complaint is a section of testimony from the direct examination of Sites, in which this exchange occurred:
[STATE]: Okay. So as a-based on your training and experience, as a forensic interviewer, you had talked about assessing children's statements during a forensic interview.
Can you just talk about some of those factors that you look to based on your training and experience with regard to assessing a child's interview?
[SITES]: When children disclose, especially younger children, they are able to verbalize some things, but sometimes they have to use other ways to explain what happened. They don't have the words to be able to describe that.
There is one thing that occurs in interviews with kids of all ages that's called idiosyncratic detail, and that's when they-they will make a gesture or a sound or use a word that is re-enacting that event, so they are thinking about that memory and they are actually re-enacting that.
So an example might be when you ask -- in her disclosure she said that [McWilliams] had touched her. And I asked her what part of her body, and she automatically pointed to her vaginal area. I didn't ask her to point to that part of her body. She pointed to that on her own.
And there are a couple of other things in the interview that occurred that-that-where she demonstrates that idiosyncratic detail, so she's acting it out as she's saying it or she's pointing it out by re-enacting the event.
At one point I asked her how it stopped, and she started stepping with her feet, and then she said that her-they could hear her mom's footsteps coming into the home. So that's something I didn't ask her to do. She just automatically did that.
She also re-enacted [McWilliams] walking out of her room and how he did that in a really fast way.
And then when I asked her how her body was positioned during the incident, she said, Here, let me just show you, and she laid on the ground of the-on the floor of the interview room and showed how her body was positioned. I didn't ask her to do that; she did that on her own.
So those are things that happen in interviews that are more than the verbal disclosure that kind of helps us understand, you know, where the child is coming from.
The State makes two arguments about this testimony. First, the State alleges that it is proper general testimony. This argument might be plausible if this were the end of the testimony; however, it is not. On the question immediately following this testimony, the State asked, "And what is the significance of a child having that [idiosyncratic] detail in their disclosure when you're assessing the interview?" McWilliams objected first to Sites's qualifications and, as described supra , later objected to this question on the basis that it was an *628 attempt to elicit Sites's opinion concerning A.M.'s credibility.[6]
After a total of three attempts to ask this question and accompanying objections, the State asked Sites this question: "The significance of a child's demonstrating idiosyncratic detail during an interview, what significance does that have with assessing the reliability of the process of the interview that's being conducted with that child?" Sites responded:
When we interview children, we are not only looking at their-their verbal disclosure, but part of the reason why we video or digitally record interviews is so that we can document their behaviors and emotions during an interview which can-it is difficult to document that in a written report. So it speaks volumes.
And when children do that, it's not-it's spontaneous. It's something that's coming from them as they're making that statement and it's not something that's expected or anticipated.
So it-it demonstrates how they experienced that memory.
The prosecutor then looped Sites's previous testimony in her question, saying: "So you indicated in the interview several examples of A.M. being able to give idiosyncratic detail. What other factors based on your training and experience as a forensic interview -- interviewer are looked to in assessing the interview of the child?" Sites gave the following answer, which forms the basis for McWilliams's second complaint that Sites was permitted to testify concerning A.M.'s lack of suggestibility:
Their ability to communicate. We hope that they can communicate in a narrative way, but with six-year-olds, that can be difficult because they don't have the cognitive ability.
We look for their ability to correct the interviewer during the interview, which [A.M.] does several times, and that-that shows her lack of suggestibility.
So with younger children-
McWilliams interrupted Sites's answer and renewed his previous objection that Sites's testimony on suggestibility was a direct comment on A.M.'s credibility. The court overruled McWilliams's objection.
Immediately following the objection, this exchange occurred:
[STATE]: You were talking about A.M. specifically with regard to being able to correct the interviewer when answering questions. I'm going to step back and come back to that in a minute.
Based on your training and experience as a forensic interviewer, what do the studies and everything that you are trained in tell you as a forensic interviewer about the suggestibility of children and their age?
[SITES]: For children who are preschool age, that would be five and younger, are more suggestible than older children. So when we're interviewing younger children, we have to gauge their suggestibility at the interview.
Part of the reason why we give those rules at the beginning in that introductory phrase are to set that-that standard in the interview so that they understand the expectation. And we'll practice it with younger kids, and they'll usually get it right.
But some kids don't do it in the interview, and A.M. actually did on her own. She would correct me in different circumstances, and that was a good thing. That showed me that she didn't see me as a person in a position of authority, that she was afraid to correct. She felt *629 comfortable correcting me in that situation to make sure I had the right information.
[STATE]: In addition to the idiosyncratic detail, the ability to correct, let me ask you this: What about the ability of the child to correct themselves if they make a mistake?
[SITES]: That's significant as well. And there were times in the interview when A.M. made one statement and she couldn't remember the name of her partner playing Play-Doh, and I said, [t]hat's okay. We talked about if you don't know something, say I don't know. And then later on she goes, [w]ait a minute. I remember his name. It was Elijah or Eliah, or something like that. So she was able to come back later on on her own and correct and provide that information.
If each of the questions and responses in this exchange were considered separately, they could arguably be characterized as generalized testimony, as the State contends. However, when read as a whole, this testimony clearly demonstrates that the State was asking Sites to comment on A.M.'s credibility. The testimony was designed to buoy and lend credibility to A.M.'s testimony after A.M. testified that she did not remember why she and her mother stopped living with McWilliams and expressed that she did not remember anything happening between her and McWilliams.[7]
The State argues that State v. Rogers , 529 S.W.3d 906, 916 (Mo. App. 2017), should inform our decision on this matter. In Rogers , we reversed a judgment based on the State's solicitation of "at least twenty specific examples of how Child's statements or behavior evinced a common profile," and sixteen uses of the phrase "indicator of reliability." Id. While we agree that the State in Rogers far exceeded the bounds of proper inquiry, we cannot agree that Rogers sets forth the only grounds upon which we can find error.
Further, the State alleges that any comments on A.M.'s suggestibility were "brief and not emphasized." In support of this argument, the State cites State v. Collins , 163 S.W.3d 614 (Mo. App. 2005). In Collins , the defendant did not object to several comments on the victim's credibility. Id. at 620. Because the defendant in Collins failed to object, we reviewed his claim for plain error. Id. Thus, Collins is not applicable to McWilliams's appeal. Moreover, even if it were, the objectionable questions in this case made up a significant portion of Sites's testimony, and the State looped her answers concerning credibility into its questioning of Sites.
While witnesses do often offer testimony that the State does not intend to elicit, where the State " 'insists on walking the precipice of reversible error, it must be prepared to suffer the consequences of stepping over the edge-reversal and remand for a new trial.' " Rogers , 529 S.W.3d at 916 (quoting State v. Moore , 352 S.W.3d 392, 404 (Mo. App. 2011) ). Sites's testimony was improper; therefore, the circuit court abused its discretion in allowing this testimony.
Our analysis does not end here, however, as we must determine whether McWilliams was prejudiced by the admission of the improper testimony. "Trial court error in the admission of evidence is prejudicial if the error so influenced the jury that, when considered with *630 and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." State v. Miller , 372 S.W.3d 455, 472 (Mo. banc 2012). "[O]verwhelming evidence of guilt may lead an appellate court to find that a defendant was not prejudiced by trial court error." State v. Banks , 215 S.W.3d 118, 121 (Mo. banc 2007).
Here, the remaining evidence of McWilliams's guilt cannot be characterized as overwhelming. The State provided evidence concerning holes that were drilled into the wall of the bathroom adjoining A.M.'s room and another hole drilled into the wall separating McWilliams's closet and the bedroom in which Mother and A.M. slept. The prosecution made several arguments about McWilliams using these holes as ports through which to view A.M. Further, the State provided testimony concerning several statements McWilliams made. In the first of these statements, McWilliams referred to the toothbrush, which A.M. had alleged was the instrumentality of sexual touching, as a vibrator. The second involved McWilliams's responses to the officers serving the search warrant. Det. Perkins testified that McWilliams stated: "There [ ] haven't [been] any children here within two-the last two weeks." The State also provided testimony that A.M. wrote a letter in which she asked McWilliams not to touch her again. Finally, the State presented the toothbrush, which it alleged McWilliams used to sexually abuse A.M.
We do not find this evidence of McWilliams's guilt to be overwhelming. McWilliams's defense hinged greatly on the jury finding A.M. lacked credibility. Because of A.M.'s difficulty on the stand, Sites's testimony was paramount to the State's case. This importance was magnified by the defense's argument concerning the provenance of the toothbrush-or more precisely, that officers did not find the toothbrush, despite executing a search warrant, until Mother provided it to them. The defense's argument becomes much more effective without Sites's testimony improperly buttressing A.M.'s credibility. Therefore, Point I is granted.
POINT II
In Point II, McWilliams argues that the circuit court erred in not allowing McWilliams to inquire about Mother's potential coaching of A.M.'s statements. McWilliams asserts that this line of questioning would not open the door for the State to inquire about otherwise excluded allegations of other bad acts concerning another allegation of sexual abuse against him. McWilliams claims that he wanted to ask questions concerning this alleged coaching to both Mother and Det. Perkins. As McWilliams has only preserved the exclusion of Det. Perkins for appellate review, we will address the witnesses separately.
During his cross-examination of Mother, McWilliams attempted to question Mother about conversations she had with A.M. to illuminate what he saw as Mother coaching A.M. to provide certain statements. The State objected, and during a lengthy bench conference, McWilliams made this offer of proof:
So the question I asked and drew an objection to was to the effect of she had asked-prior to the 22nd of December, [Mother] had asked [A.M.] on several occasions if [McWilliams] had touched her or done anything to her. The State objected.
I anticipate she would say no or she might have actually said no, too. I was going to follow that up by asking that when you talked to Perkins you told Perkins you asked [A.M.] all the time if *631 [McWilliams] touched her and if [McWilliams] had done anything to her.
And then while she was in the interview room with Detective Perkins and [A.M.], she told [A.M.] ["]Remember what I told you,["] and then after that I was going to ask that-if the witness if there-she made that statement, ["]remember what I told you?["] Detective Perkins escorted her out of the interview room.
Those are the question I was going to ask along this line.
To preserve his claim of improperly excluded evidence, McWilliams had to attempt to present the evidence at trial and, after the circuit court's denial, he had to make a sufficient offer of proof. State v. Hunt , 451 S.W.3d 251, 263 (Mo. banc 2014). An offer of proof is necessary "to preserve the evidence so that [we understand] the scope and effect of the questions and proposed answers in considering whether the trial judge's ruling was proper[.]" State v. Tisius , 92 S.W.3d 751, 767-68 (Mo. banc 2002). In an offer of proof, the proponent "must show what the evidence will be, the purpose and object of the evidence, and each fact essential to establishing admissibility." Hunt , 451 S.W.3d at 263. The proponent may make his offer of proof in an informal, narrative manner, but it must still be specific and definite to garner review. Id.
McWilliams has failed to demonstrate what Mother's testimony would actually be. He made several conjectures about what it might be, but immediately following the offer, McWilliams stated that he did not know what Mother's response would be to the questions concerning the statements made in the interview room. Therefore, McWilliams did not preserve this claim for appellate review. Consequently, it may be reviewed only for plain error. See State v. Baumruk , 280 S.W.3d 600, 607 (Mo. banc 2009).
Plain errors are those which are "evident, obvious, and clear[.]" State v. Scurlock , 998 S.W.2d 578, 586 (Mo. App. 1999) (alteration in original) (citation omitted). Plain error review is a two-step process. Baumruk , 280 S.W.3d at 607. We must first make "a determination of whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." Id. (internal citations and quotations omitted). If plain error is found, we must then move to the second step in which we determine " 'whether the claimed error resulted in manifest injustice or a miscarriage of justice.' " Id. at 607-08 (quoting Scurlock , 998 S.W.2d at 586 ).
After a lengthy bench conference, the court determined that McWilliams could not engage in this line of questioning because the court was concerned that it would open the door to other bad acts evidence. That decision was firmly within the circuit court's broad discretion on matters of admissibility. We cannot fault the court for declining to accompany McWilliams on his fishing expedition. It is not "evident, obvious, or clear" that any error occurred here, and McWilliams has alleged nothing that rises to the level of manifest injustice. Therefore, we deny McWilliams's claim with regard to Mother.
McWilliams's offer of proof as to the questioning of Det. Perkins was properly preserved, but it is without merit. McWilliams sought to ask Det. Perkins about the same allegations of coaching, and he made an offer of proof that presented such evidence. However, McWilliams has not provided any reason why we should disturb the circuit court's decision to exclude it. At trial, McWilliams essentially conceded that the circuit court's fear that this testimony would open the door for inquiry into other bad acts was correct. When pressed by the *632 circuit court to provide a reason as to why this evidence would not open the door, defense counsel stated: "I don't have a response basically." Therefore, the circuit court did not abuse its discretion in denying McWilliams's claim with regard to Det. Perkins. Point II is denied.
POINT III
In Point III, McWilliams contends that the circuit court erred in admitting a photograph of McWilliams in which his horn tattoos are visible. McWilliams asserts this photo, when paired with the testimony from A.M. about him turning into a devil, was unduly prejudicial.
Generally, relevance is a two-fold consideration that encompasses both logical and legal relevance. State v. Anderson , 76 S.W.3d 275, 276 (Mo. banc 2002). In order to be admissible, evidence must be both legally and logically relevant. Tisius , 92 S.W.3d at 760. Logical relevance is a low hurdle to clear; to be logically relevant, evidence must tend to make a "fact of consequence" more or less probable, State v. Miller , 208 S.W.3d 284, 287 (Mo. App. 2006), or "tend[ ] to corroborate evidence which itself is relevant and bears on the principal issue of the case." Tisius , 92 S.W.3d at 760. "Evidence is legally relevant if its probative value outweighs its costs-prejudice, confusion of the issues, misleading the jury, undue delay, waste of time or cumulativeness." State v. Barriner , 111 S.W.3d 396, 401 (Mo. banc 2003). The determination whether evidence is legally relevant is firmly within the circuit court's discretion. Tisius , 92 S.W.3d at 760.
We cannot say the circuit court abused its discretion in admitting the photo of McWilliams. "Photographs are relevant if they show the scene of the crime, the identity of the victim ... or otherwise constitute proof of an element of the crime or assist the jury in understanding the testimony." State v. Rousan , 961 S.W.2d 831, 844 (Mo. banc 1998). Here, the photo corroborated A.M.'s fear of McWilliams, assisted the jury in understanding A.M.'s testimony about McWilliams turning into the devil, and helped explain A.M.'s reticence to fully testify during the trial. McWilliams's assertion that there was "no need to introduce his mugshot except to prejudice him" misstates the test for admissibility. Need is not the test. The photo is, at the very least, arguably legally and logically relevant. Therefore, the circuit court did not abuse its discretion in admitting the photo.
Further, McWilliams's reliance on Banks is misplaced. In Banks , the prosecutor stated during closing argument:
[Police detectives] didn't just go on the word of a crack addict. They had several witnesses.
And, ladies and gentlemen, when the scene is set and held and we have to go and catch the Devil, there are no angels as witnesses. This is Hell. He is the Devil. They aren't angels. He is guilty beyond a reasonable doubt.
215 S.W.3d at 119 (alteration in original). The Supreme Court of Missouri held, in part, that this "remark was pure hyperbole, an ad hominem personal attack designed to inflame the jury." Id. at 121.
Unlike in Banks , the argument at issue here was not a hyperbolic ad hominem attack. During her interview with Sites, A.M. stated she did not want to talk about the event in question because she believed that McWilliams would turn into a devil. In its closing argument, the State argued that A.M. was afraid of McWilliams in an attempt to explain the testimony given by the witnesses at trial. The reasoning set forth in Banks is not applicable to the circumstances in this case. Point III is denied.
*633 CONCLUSION
McWilliams's conviction is reversed, and the case is remanded for a new trial consistent with this opinion.
All Concur.

Because the parties refer to Christopher by his first name, and his last name is absent from the record, we will also refer to him as simply "Christopher."

Mother testified that she found the toothbrush under an amplifier that was placed on McWilliams's desk.

The second child accuser was named, but for the sake of privacy we will refer to her by this pseudonym.

While a motion to strike the previous testimony would likely be better practice, it is not necessary to preserve McWilliams's specific point on appeal.

The request for a continuing objection ... signifies the mutual understanding between defense counsel, opposing counsel and the trial court that defense counsel intends to keep his objection alive throughout the trial. When a defendant requests a continuing objection the trial court is afforded an opportunity to determine and consider the exact nature and scope of the requested objection and the inherent problems associated with such an objection ... The request also gives the State an opportunity to address to the trial court any prejudice it believes it may suffer as a result of allowing the defendant to preserve an objection to evidence while at the same time appearing to the jury to have "no objection" to such evidence.
State v. McWhorter , 240 S.W.3d 761, 763-64 (Mo. App. 2007).

At this point, the circuit court also expressed concern that this question would elicit testimony as to Sites's opinion about A.M.'s credibility.

This court cannot, and does not expect, A.M. to testify with perfect recall. Nor does it underestimate the stresses that an eight-year-old child experiences while testifying. However, the testimony as presented must direct our analysis.