

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | WD85002 |
| v. | ) | |
| | ) | OPINION FILED: |
| | ) | April 11, 2023 |
| VIOLA BOWMAN, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
**The Honorable Shane T. Alexander, Judge**

**Before Division Three:** Thomas N. Chapman, Presiding Judge, and
Mark D. Pfeiffer and Cynthia L. Martin, Judges

Ms. Viola Bowman ("Bowman") appeals from the judgment entered by the Circuit

Court of Clay County, Missouri ("trial court"), following a jury trial in which she was

found guilty of murder in the first degree and armed criminal action. Bowman challenges

the trial court's rulings admitting evidence of her demeanor and appearance after the

death of her husband, Albert Bowman ("Victim"). But, because Bowman cannot

demonstrate any outcome-determinative prejudice in the introduction of the

complained-of evidence, we affirm.

**Facts and Procedural History**[1]

At the time of Victim's death, Victim and Bowman had been married thirty-five years. Victim was "king of the castle" and believed that his wife should stay home and cook and take care of the kids and that he was the financial provider. This created friction in the relationship, including fighting and bickering over issues such as money. Although they appeared to be on the verge of a divorce many times over the years, Victim believed divorce was not an option; that no matter what, you stayed married for your children.

On October 30, 2012, about a week before Victim was murdered, Bowman went to Bank Liberty, the bank through which she and Victim had a home mortgage. She spoke to personal banker, Angela Woody, and asked about their mortgage life insurance, including whether, if something happened to Victim, the mortgage would be paid off. For the one and only time during her twenty-five-year banking career, Ms. Woody took notes of the conversation because it seemed extremely odd to her that Bowman asked so many questions about Victim and the insurance if he was not sick but asked nothing about what if something bad happened to her.

Also, about a week before Victim was murdered, Bowman went to the salon where she had her hair done with a bag under her arm. She told the salon owner she was looking for the barber who worked at the salon and who had a federal firearms license

---

[1] "On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." *State v. Berwaldt*, 652 S.W.3d 793, 795 n.3 (Mo. App. W.D. 2022) (internal quotation marks omitted).

and bought and sold guns. The salon owner told Bowman that the barber was not there and asked what she needed. Bowman said she needed somebody to unjam her gun. The salon owner suggested that Bowman go to a nearby firing range to see if somebody there could help her.

On November 6, 2012, Bowman attempted to contact her neighbor, Kenny Harris, to ask for help with a weapon that she had jammed, but he was not at home. Mr. Harris had a federal firearms license, was a firearms dealer, and Bowman and Victim had been students in Mr. Harris's conceal-and-carry class in March 2012. Bowman sent another Facebook message a couple of hours later that the weapon was still jammed and requested that Mr. Harris look at it in the morning.

On November 7, 2012, Victim arrived at work at the City of Kansas City Water Department at 5:41 a.m. and left for the day at 4:46 p.m. Bowman spoke with her daughter, Pamela Franklin, from 7:30 p.m. to 7:45 p.m. Ms. Franklin heard Victim in the background. Bowman appeared "[r]ushed" and "[k]ind of out of breath" on the phone.

Victim's pacemaker recorded a sudden bradycardia episode at 8:43 p.m. At 9:08 p.m., Bowman telephoned Mr. Harris's girlfriend about exchanging Girl Scout cookies. Bowman went over to Mr. Harris's house about ten minutes later and mentioned that she was going to Walmart to get ingredients to make a dessert for Victim. Surveillance video captured Bowman entering the Walmart store at 10:03 p.m. and exiting the store at 10:19 p.m. At approximately 10:15 p.m., Bowman posted on Facebook that she had to go to the store because Victim wanted caramel apples. She then purchased gas at QuikTrip at 10:26 p.m.

At approximately 10:37 p.m., a unit from the Kansas City Fire Department was dispatched to Bowman and Victim's house after a 911 caller reported a heart problem or cardiac arrest. When the unit arrived on the scene, Bowman met the crew in the driveway and stated that "somebody had broke[n] into her house or had been in her house, that tools were moved, and she was showing [the fire captain] that and not the patient." At no point did Bowman ask the fire captain about Victim's condition. Bowman told the fire captain that she had been to Walmart "and the receipt with the time and date was laying on the floor." The fire captain found Bowman's behavior "kind of weird" because nobody "says that, especially when your loved one's died."

Two Kansas City Fire Department firefighters were the first responders to enter Bowman and Victim's house, followed by two paramedics. Victim was found in a recliner with "major trauma to his face," "no audible heart tones, no breathing[,] and no palpable pulses," and the body was cool to the touch in the extremities and the core. The firefighters reported to the fire captain that Victim had been shot. The captain ordered her crew to leave the house for their safety and to preserve the crime scene.

As the crew was leaving, Bowman approached one of the paramedics three or four times, insisting that he look at the Walmart receipt and pointing out what she had bought and the time stamp. She also mentioned that she thought there might be a couple of guns missing from the house and possibly some tools out of the garage. Bowman neither asked the paramedic about the Victim's condition nor appeared to the paramedic to be upset at Victim's unexpected death.

4

Kansas City Police Department officers arrived on the scene in response to a call from dispatch about a shooting. The officers cleared the scene and did not find any suspects. Kansas City Police Department detective Scott Emery also responded to the scene.

Kansas City Police Department crime scene technicians processed the crime scene on November 8, 2012. At the back of the residence, the technicians found an overturned barbeque grill, a .22 revolver, a black travel bag, and a black Vivitar digital camera. The technicians observed ash from the grill on the camera and bag. The technicians found no signs of forced entry, and there was no damage to any of the doors or locks. The lower level of the house was used as a bedroom. The technicians found Victim's body in the recliner with bullet wounds on his forehead and lower left chest. The technicians found a .40 caliber casing on the floor outside a closet door. When Victim's body was removed, the technicians found blood stains on the back of the recliner and on the floor between the bed and the recliner. Another casing was found under the bed. On the bed was an open gun box and a magazine with .40 caliber rounds. On the desk was an open ammunition box of .22 caliber rounds, a brown gun holster, and a small rag. A .22 caliber revolver was recovered from the backyard of the residence.

The Kansas City Police Department crime lab blood stain pattern analysis technical leader processed the scene on November 7 and 8, 2012. Her findings were consistent with Victim being shot first in the head and then in the chest, between three and fifteen minutes apart. She found no physical evidence that CPR was performed on Victim.

The Kansas City Police Department crime lab crime scene supervisor assisted a crime scene technician in processing the crime scene from 12:25 a.m. to 3:00 a.m. on November 8, 2012. They found items dropped sequentially in a line outside of the house in the direction of a wooded area. The items that were dropped were more than one person could carry. In a clearing approximately 108 feet away from the residence, they found a black velveteen pouch on the ground containing jewelry, which Bowman identified as hers.

On November 8, 2012, Kansas City Police Department homicide unit master detective Matthew Williams and detective Brent Taney interviewed Bowman between 2:00 a.m. and 5:00 a.m., and she provided specific details to the detectives. The detectives noticed that Bowman had an "ashy gray" substance on her hands. She still had Victim's blood on her during the interview. Detective Taney noticed discrepancies between the transcript of the 911 call and Bowman's statements during the interview. During the 911 call, Bowman told dispatch that "our guns are gone"; but during the interview, she said that she was not sure the guns were in the residence because "she was more concentrated on [Victim]." Also, in the 911 call, she mentioned that the back door to the residence was open; but in the interview, she told the detectives that she did not realize the back door was open until after the paramedics arrived.

Dr. Robert Pietak of the Jackson County Medical Examiner's Office performed an autopsy on Victim on November 8, 2012. Dr. Pietak observed two gunshot wounds to Victim's body, one to the front of Victim's head, damaging his brain, and one to the upper left chest, striking his heart. Dr. Pietak determined that the shot to Victim's head

6

was not fired at close range, but the shot to Victim's chest was fired at close range. He also determined that either injury could have been fatal. Dr. Pietak concluded that the cause of death was multiple gunshot wounds, and the manner of death was homicide.

The Kansas City Police Department crime lab firearms examiner found that both bullets recovered by the medical examiner from Victim's body were fired from the same unknown firearm. Both the bullets recovered from Victim's body and the cartridge cases recovered from the scene were .40 caliber.

On November 9, 2012, Bowman called Ms. Woody at Bank Liberty and asked about the mortgage life insurance. She told the banker that she had been questioned by detectives, but she was not worried. She said she knew she was "in the clear" because she was on surveillance cameras at both her neighbor's house, in that she went there to see if they also wanted some dessert, and at the place she purchased the dessert. She told Ms. Woody that when she got home, not only did she find Victim dead but she found some things moved around.

On November 30, 2012, Bowman agreed to provide her laptop to Detective Emery. As she was leaving police headquarters, she asked Detective Emery, "So am I off the suspect list now?" Detective Emery had never told Bowman she was on a suspect list, and, in fact, he did not have a suspect list. Bowman contacted Detective Emery again in January 2013 and asked him if he "had been aware of any rash of elderly people whose homes were being robbed and the victims of those robberies being killed and no items were taken." Detective Emery told Bowman that he was unaware of any incidents other than hers.

During the week of January 7, 2013, Bowman went to Bank Liberty to make a claim on the mortgage life insurance. Ms. Woody noticed that Bowman looked nice: she had cut her hair much shorter, her nails were manicured, and she was carrying a new purse.

In May 2013, Bowman contacted Detective Emery again and told him that "she was running out of money and that she needed to get off the suspect list so that she could get paid the [V]ictim's insurance policy."

Subsequently, the State indicted Bowman for the class A felony of murder in the first degree for knowingly causing Victim's death by shooting him and for the felony of armed criminal action.

While in the Clay County jail, Bowman confessed to fellow inmate Katie Cheek that she had killed Victim by shooting him with a pistol while he was in his recliner, first in the head and then in the heart to stop his pacemaker so the pacemaker would not keep him alive. Bowman then told Cheek that she left the house, threw one of the other handguns into the yard to make it look like a burglary, and went to the gas station and to Walmart to get receipts to show that she was at the stores at the time Victim was shot. Bowman told Cheek that she murdered Victim because "[s]he was just tired of taking care of him. It was just a burden to her," and "[s]he wanted his insurance money[.]"

Bowman testified at trial. She stated that on November 6, 2012, she was cleaning the .40 caliber handgun because she and Victim were going to attend a conceal-and-carry class. The gun jammed, and she had Victim unjam the gun for her that evening. Bowman testified that when Victim got home from work on November 7, 2012, they

8

worked on the fence in their yard. She claimed that the aluminum coating on the fencing rubbed off on her hands leaving a gray metallic coloring that would not wash off with hand soap. She testified that after working on the fencing and eating dinner, she showed Victim a recipe for caramel baked apples, and he talked her into going to Walmart to get the ingredients. She stated that when she got home after going to Walmart and getting gas, she found a bag of tools in the foyer and items spread out in the bedroom. She discovered Victim's body "covered in blood" and started shaking him. Bowman testified that she called 911 and attempted CPR on Victim.

Following the jury trial, Bowman was found guilty as charged.

Bowman filed a motion for judgment of acquittal or, in the alternative, for a new trial, alleging in part that the trial court erred by failing to sustain her motion in limine which, in pertinent part, sought to exclude what she claimed were unfair character attacks on defendant.[2]

---

[2] Bowman filed a pre-trial motion in limine seeking to exclude any reference to, among other things:

> That after the death of her husband, the defendant had her hair cut off shorter (which she said her husband had not allowed), had her nails done, purchased a new purse, allegedly appeared to be in a care free mood, seemed happy at the funeral, and appeared to not be in mourning.

She contended that such information was irrelevant, invaded the province of the jury, and was "in reality a direct attack on the character of the defendant." The trial court denied the motion. "'A ruling on a motion in limine is interlocutory and subject to modification at trial.'" *State v. Wheeler*, 539 S.W.3d 41, 44 n.2 (Mo. App. W.D. 2017) (quoting *State v. Blurton*, 484 S.W.3d 758, 775 (Mo. banc 2016)). "'Accordingly, a motion in limine, in and of itself, preserves nothing for appeal.'" *Id.* (internal quotation marks omitted) (quoting *Blurton*, 484 S.W.3d at 775). "To preserve a claim of error relating to the

Specifically, Bowman challenged the trial court's admission of the testimony of Ronald Anderson, Pamela Franklin, and Angela Woody over her continuing objection. Mr. Anderson attended Victim's funeral wake and testified that the only thing Bowman could talk about was how "nice" her hair looked cut short and that Victim "never wanted her hair cut short." Ms. Woody, the banker, testified that when Bowman came into the bank after Victim's death, she "almost didn't recognize her" because her hair was cut short, she had a nice purse, and her nails had been manicured. Finally, Bowman and Victim's daughter, Ms. Franklin, testified that she found it "odd" that her mother had cut her hair short before "Dad's funeral" because "Dad liked long hair."

The trial court denied Bowman's motion for judgment of acquittal or, in the alternative, for new trial. On November 10, 2021, the trial court entered judgment on the guilty verdicts and sentenced Bowman to life imprisonment without eligibility for probation or parole on the murder conviction and to ten years' imprisonment on the

admission of evidence, a party must make an objection at the time the evidence is sought to be admitted at trial." *State v. Jackson*, 636 S.W.3d 908, 918 (Mo. App. W.D. 2021).

After Bowman's opening statement, defense counsel renewed the motion in limine. The trial court again denied the motion. After denying the renewed motion in limine, the trial court asked if counsel would like a continuing objection, and counsel responded, "Yes, that's what I request." This exchange regarding a continuing objection was sufficient to permit us to conclude that it was Bowman's intent to object on a continuing basis to all testimony about her appearance and demeanor after Victim's death: "'The request for a continuing objection . . . signifies the mutual understanding between defense counsel, opposing counsel and the trial court that defense counsel intends to keep his objection alive throughout the trial.'" *State v. Mosely*, 599 S.W.3d 236, 255 (Mo. App. W.D. 2020) (quoting *State v. McWilliams*, 564 S.W.3d 618, 626 n.5 (Mo. App. W.D. 2018)).

armed criminal action conviction, to be served consecutive to the sentence for the murder conviction.

Bowman timely appealed.

## Standard of Review

"The determination whether evidence is legally relevant is firmly within the circuit court's discretion." *State v. McWilliams*, 564 S.W.3d 618, 632 (Mo. App. W.D. 2018) (citing *State v. Tisius*, 92 S.W.3d 751, 760 (Mo. banc 2003)).[3] We review the trial court's decision to admit or exclude evidence at trial for abuse of discretion. *State v. Jackson*, 636 S.W.3d 908, 919 (Mo. App. W.D. 2021). "A trial court abuses its discretion when its 'ruling admitting or excluding evidence is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id.* (internal quotation marks omitted). Evidentiary error alone does not require reversal; the appellant must have suffered prejudice as a result of the admission of the evidence. *Id.* "Trial court error in the admission of evidence is prejudicial if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted,

---

[3] Evidence must be both logically and legally relevant to be admissible. *State v. Putfark*, 651 S.W.3d 869, 881 (Mo. App. W.D. 2022). However, Bowman's point relied on only challenges the legal relevance of the complained-of evidence and only mentions logical relevance in the argument portion of her brief. "[W]e do not consider arguments raised in the argument portion of the brief that were not encompassed in the points relied on." *State v. Gilbert*, 628 S.W.3d 702, 713 (Mo. App. W.D. 2021) (internal quotation marks omitted). Irrespective, as we explain in our ruling, the dispositive defect in Bowman's appeal is that she cannot demonstrate outcome-determinative prejudice from the introduction of the alleged erroneously admitted evidence.

there is a reasonable probability that the jury would have reached a different conclusion without the error." *Id.* (internal quotation marks omitted); *see also McWilliams*, 564 S.W.3d at 632 (citing *Tisius*, 92 S.W.3d at 760).

As we discuss in today's ruling, there simply is no outcome-determinative prejudice in the isolated reference to the evidence Bowman complains of.

**Analysis**

On appeal, Bowman asserts that the trial court abused its discretion in permitting the admission of evidence about her hairstyle and emotional state after the death of Victim because the evidence was not legally relevant. Bowman argues that the three witnesses called by the State—Mr. Anderson, Ms. Woody, and Ms. Franklin—to testify about Bowman's appearance and demeanor "served no purpose other than to inflame the passion of the jury" and "the sheer volume of erroneously admitted evidence" about her wardrobe, appearance, and demeanor was prejudicial.

We first note that the "sheer volume" of the evidence in question that Bowman claims was erroneously admitted is contained within approximately forty-two lines on six pages of a 672-page trial transcript. And, in the prosecutor's closing argument, the focus was on Bowman's deliberation: going to the neighbor's house; an allegedly jammed gun; conversations about mortgage insurance with the banker, Ms. Woody. The prosecutor actually turned the focus *away* from Bowman's appearance and demeanor after the crime: "What this is not about is whether her conduct was odd at the funeral. It's not about caramel apples really. Right? It's about deliberation. It's about using the entirety of what we've seen and we've heard to show that there is deliberation here." "[L]et's talk

12

about the crime scene, okay, because if this case was solely about her being—acting odd or cutting her hair at the funeral, then we would have been done on Tuesday. All right. We weren't." *See State v. Garretson*, 598 S.W.3d 643, 652 (Mo. App. W.D. 2020) (no prejudice found where allegedly erroneously admitted evidence was isolated in the context of the trial and was not magnified by the prosecution).

More importantly, "'[o]verwhelming evidence of guilt may lead an appellate court to find that a defendant was not prejudiced by trial court error.'" *McWilliams*, 564 S.W.3d at 630 (quoting *State v. Banks*, 215 S.W.3d 118, 121 (Mo. banc 2007)).

A person commits the crime of first-degree murder if "he or she knowingly causes the death of another person after deliberation upon the matter." § 565.020.1.[4] "[I]ntent can be inferred from the use of a deadly weapon on some vital part of the victim's body." *State v. Mills*, 623 S.W.3d 717, 725 (Mo. App. E.D. 2021). "The act of aiming and intentionally firing a gun at a victim supports an inference of a 'cool and deliberate state of mind.'" *Id*. "Deliberation" is defined as "cool reflection for any length of time no matter how brief[.]" § 565.002(5). Deliberation may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the killing. *State v. Johns*, 34 S.W.3d 93, 110 (Mo. banc 2000). Deliberation can be inferred from evidence of planning. *State v. Vickers*, 560 S.W.3d 3, 22 (Mo. App. W.D. 2018).

Bowman's fellow inmate provided direct evidence of Bowman's guilt. Katie Cheek testified that Bowman *confessed* to her that Bowman had killed Victim by

---

[4] All statutory references are to the REVISED STATUTES OF MISSOURI 2016, as supplemented.

shooting him with a pistol while he was in his recliner.  Bowman admitted to Cheek that she shot Victim first in the head and then in the heart to stop his pacemaker so the pacemaker would not keep him alive.  *See Tisius*, 92 S.W.3d at 764 (finding of deliberation supported by repeated shooting at close-range).  Bowman told Cheek that she left the house, threw one of the other handguns into the yard to make it look like a burglary, and went to the gas station and to Walmart to get receipts to show that she was at the stores at the time Victim was shot.  "[A] permissible inference of guilt may be drawn from acts or conduct of an accused subsequent to an offense if they tend to show a consciousness of guilt by reason of a desire to conceal the offense or role therein."  *State v. Norman*, 618 S.W.3d 570, 580 (Mo. App. W.D. 2020) (internal quotation marks omitted).

The State also presented circumstantial evidence of Bowman's guilt supporting a determination that Bowman deliberated on Victim's death.  About a week before Victim was murdered, Bowman inquired of her banker, Ms. Woody, that if something happened to Victim, would the mortgage be paid off.  Ms. Woody even asked if Victim was sick, and Bowman told her he was healthy—which caused Ms. Woody to feel very uneasy about the conversation.  And, days before Victim's murder, Bowman attempted to contact several people to help her unjam a firearm that she had jammed while cleaning it—a weapon that not so coincidentally functioned with the same bullet caliber ammunition as that used in Victim's murder.

Further, "[g]uilt may be inferred when an accused attempts to deceive the police, as in making a false exculpatory statement."  *Id.* (internal quotation marks omitted).  On

14

the night of the murder, Bowman attempted to create an alibi. "An alibi is [a] defense that places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it *impossible* for defendant to be the guilty party." *Vickers v. State*, 632 S.W.3d 781, 786 (Mo. App. W.D. 2021) (internal quotation marks omitted). Bowman went to her neighbor's house and mentioned that she was going to Walmart to get ingredients to make a dessert for Victim; she went to Walmart and was seen on surveillance video; she posted on Facebook that she had to go to the store because Victim wanted caramel apples; and then she purchased gas at QuikTrip. When the firefighters arrived on the scene, Bowman met the crew in the driveway and was more concerned with attempting to establish her alibi defense than to take the firefighters to her husband. Clearly, the jury did not find Bowman's alibi story to be credible; rather, they found it to be a failed alibi cover-up attempt by Bowman—consistent with the jailhouse confession she made to her fellow inmate.

Finally, Bowman also gave multiple inconsistent statements to the police. When Bowman called 911, she reported Victim was suffering from a heart problem or cardiac arrest, even though the first responders found that Victim had been shot. During the 911 call, Bowman told dispatch that "our guns are gone"; but during her interview with police, she said that she was not sure the guns were in the residence because "she was more concentrated on [Victim]." Also, in the 911 call, she mentioned that the back door to the residence was open; but in the interview, she told the detectives that she did not realize the back door was open until after the paramedics arrived. In addition, Bowman

15

claimed that she performed CPR on Victim, but there was no physical evidence that she had done so.

This extensive evidence presented at trial was relevant and probative of Bowman's guilt and, frankly, demonstrated *overwhelming* evidence of her guilt. There is no reasonable probability that the evidence of Bowman's appearance and demeanor at a funeral or wake after Victim's death affected the outcome of the trial. Therefore, the admission of such evidence could not have resulted in prejudice to Bowman. "Given the overwhelming evidence of [Bowman's] guilt, there simply is no reasonable probability that the jury would have reached a different conclusion even were we to conclude that the trial court committed the . . . evidentiary errors complained of on appeal—which we do not." *State v. Kelly*, 604 S.W.3d 672, 680 n.4 (Mo. App. W.D. 2020).

Point denied.

### Conclusion

The trial court's judgment is affirmed.

/s/ *Mark D. Pfeiffer*
Mark D. Pfeiffer, Judge

Thomas N. Chapman, Presiding Judge, and Cynthia L. Martin, Judge, concur.

16