

# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI,          )      *Opinion issued August 12, 2025*
                         )
     Respondent,            )
                         )
v.                              )      No. SC100847
                         )
DUSTIN CURTIS WINTER,       )
                         )
     Appellant.             )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY
The Honorable David C. Jones, Judge

Dustin Curtis Winter appeals his convictions for first-degree murder and first-degree kidnapping. Winter argues the circuit court erred in overruling his motion for judgment of acquittal because there was insufficient evidence for a reasonable jury to find him guilty of either charge. Winter also claims the circuit court plainly erred because its written judgment differed materially from its oral pronouncement of sentences. This Court has jurisdiction pursuant to article V, section 10, of the Missouri Constitution. Winter's convictions are supported by sufficient evidence, and the matter is remanded solely for the purpose of correcting *nunc pro tunc* the written judgment to reflect the oral pronouncement of sentences.

# BACKGROUND

In the second week of July 2019, Winter told two friends, A.S. and K.P., that Winter wanted to "f**k [Victim] up" because Victim had allegedly robbed Winter and raped Winter's girlfriend, S.S. Winter asked A.S. to help him beat up Victim. Winter rented a U-Haul van and agreed with A.S. and K.P. he would lure Victim to a house on Central Avenue in Springfield by "play[ing] nice" so Victim would "agree to come help him or hang out with him or do something." On July 23, Winter told S.S. he was "going after [Victim] and going to make sure he suffers slowly with pain and agony. At that point 5-0 can come get some too [be]cause I'm down." S.S. responded, asking Winter to "stop this self-destructive pattern." Winter said: "[L]ike I said, I'm going after [Victim]" and "[g]uess I'll be handling it by myself which is cool I guess."

At 5:21 p.m. on July 26, 2019, Winter messaged Victim: "Hey, if you ain't doing sh*t, could I get your help possibly?" Winter claimed to need an "extra set of hands for a couple of items and company so I ain't so bored." Victim responded: "K. What time?" At 7:13, Winter replied: "just whenever you'd be available [be]cause obviously I'd pick you up and drop you off wherever afterwards." Fifteen minutes later, Winter texted K.P. to remind her: "PVC pipe and zip ties, items not to forget lol."

At 7:52 p.m., Winter spoke to Victim on the phone for nearly four minutes. He then texted K.P.: "Just got off the phone with [Victim] and being told where to pick him up. How's it look on that end?" At 8:46 p.m., Winter texted K.P. that he was heading to pick up Victim. He was driving the U-Haul van he had rented for this purpose. Then minutes later, K.P. responded she and A.S. would meet Winter "where we talked

2

about[.]" At 9:07 p.m., Winter texted K.P. that he was "in [sic] route to get [Victim,]" and K.P. responded: "K. we're here," meaning she and A.S. were at the house on Central Avenue where they had agreed Winter would bring Victim.

At 9:21 p.m., while waiting for Victim to return from the grocery store, Winter texted S.S.: "I love you and I miss you so much. I haven't been ignoring you. I've been overloading myself fulfilling my word to you. I'm about to call you though." Winter then had two phone conversations with S.S. lasting more than six minutes. GPS data from Winter's phone indicates he was near Victim's apartment at the time of these calls.

Between 9:41 and 10:19 p.m., Winter and Victim exchanged texts and short phone calls arranging for Winter to pick up Victim. At 10:41 p.m., GPS data showed Winter and Victim had arrived at the Central Avenue house where K.P. and A.S. were waiting. At 10:48 p.m., K.P. texted A.S. that Winter and Victim were "under the carport." At 10:50 p.m., A.S. texted Winter: "Bro, wtf." Winter responded with a question mark and, at 10:52 p.m., A.S. replied: "Nothing id [sic] going as planned … We should have done more planning." Winter responded: "I just need the gate open so we can walk through. That's the only hold up." A.S. replied: "I can just come open it, let yall [sic] through, and just do the damn thing if you want." Winter responded: "Sure. However works." At 11 p.m., A.S. texted Winter: "Look, bro, this f**king sh*t is stupid. Let's just f**king tell him what we are gonna do and then do it, you know." Later, K.P. (who had left the house briefly) returned to find Winter, Victim, and the van gone.

At 11:30 p.m., Winter texted S.S. that he was on the highway. There was no response. At 11:44 p.m., Winter texted S.S. again: "Call me please. Something ain't

3

right." At 12:36 a.m. July 27, S.S. texted, "Stop what you're doing." Winter replied at 12:38 a.m., "What do you mean? I'm out here driving circles waiting for you. Dude's already f**ked up." At 12:40 a.m., Winter texted S.S. again, "Call me please. I don't know what I am doing now." At 1:01 a.m., he again texted S.S., "Am I picking you up still? You coming back? Or you sticking me with this?" At 1:39 a.m., Winter texted S.S. again, "Great. Guess I'm f**ked and played on all this." GPS data for Winter's phone during this period showed him driving through and making several stops in the Mark Twain National Forest, in areas an officer described as "highly wooded, very rural, with nobody around."

At 11:33 a.m. July 27, nearly 10 hours after Winter's last text, S.S. responded that Winter "didn't get played." S.S. said Winter "kinda kept [S.S.] in the dark." Winter responded: "I suppose I did. Didn't mean to but it may have been for the best." Later that afternoon, between 6:40 p.m. and 7:01 p.m., internet search records show Winter searched for websites using the phrases "55 gallon drum," "sulfuric acid," "muriatic acid," "sulfuric acid or muriatic acid," and "sulfuric acid on animals." He also visited a website titled: "Can acid dissolve a body?"

A few days later, Winter drove the U-Haul to T.C. and D.C.'s house. After Winter spoke with T.C., she told D.C. he needed "to go get a bucket and some rags." Then Winter, T.C., and D.C. walked out of the house and looked in the back of the U-haul, where D.C. saw a "bunch of blood." Asked to describe the van further, D.C. said: "Like a horror movie." Winter was armed with a handgun, and D.C. testified Winter said: "[I]f I [D.C.] don't get in there and help clean it, that he [Winter] was going to kill me." T.C.

4

told D.C. that Winter had hit a deer with the van and, if D.C. did not help clean up the interior, D.C. would "end up like the deer." Fearing for his life, D.C. cleaned the back of the van with bleach and dish soap for two hours. While doing so, D.C. noticed a bloody rope and a trash bag in the back of the van. D.C. watched Winter put the bloody rope and trash bag into a barrel and burn them.

On August 13, 2019, D.C. contacted Springfield police, saying he had information regarding a homicide involving a U-Haul van. Based on D.C.'s information, an officer located Winter's rental van in a grocery store parking lot four blocks from D.C.'s home. As the officer watched, Winter entered the van and began to drive away. The officer activated lights and siren in an effort to pull over Winter. Winter fled at high speed, running stop signs and violating various other ordinances until he crossed the county line. At that point, the highway patrol took over the chase. Eventually, Winter lost control of the van, drove down a steep embankment, and was arrested. When the police later searched the van, they identified and photographed 32 red stains in the back of the van that appeared to the officers to be blood stains. A reactive agent (which acts as a presumptive test for blood) revealed additional blood spots even though the red stain had been washed away. Victim's DNA profile matched blood found in the van.

In a recorded phone call from the jail, Winter told T.C. she would find a black motorcycle bag in her closet and she was to "get rid of it." Winter said he brought it to her house when he brought the van to be cleaned. He said he had planned to retrieve it but was arrested before he could do so. Later, T.C. asked D.C. to get rid of the bag.

5

Instead, D.C. gave it to the police. Inside the bag were a temporary state identification card and several ATM and EBT cards, all in Victim's name.

Victim, who had been in contact with his family at least once a week prior to July 26, 2019, and who was supposed to help empty a storage shed just days after that date, was never heard from again. A missing person investigation produced no results. A police canine indicated the presence of human remains under the Central Avenue house where Winter first took Victim and in one of the areas of the Mark Twain National Forest where Winter had stopped the van on the night of July 26 into 27. No other evidence of a body was discovered, and Victim's body has not been found.

The state charged Winter with one count of first-degree murder and one count of first-degree kidnapping. After trial, the jury found Winter guilty on both charges. At sentencing, the circuit court announced Winter would be sentenced to life without parole on the murder charge, life with the possibility of parole on the kidnapping charge, and the latter to be served consecutively to the former. Winter appeals, arguing there was insufficient evidence to prove either crime and claiming the written judgment did not conform to the circuit court's oral pronouncement of sentences.

## STANDARD OF REVIEW

"[T]his Court reviews whether there is sufficient evidence to support the charged crime, based on the elements of the crime as set forth by statute and common law and the evidence adduced at trial." *State v. Jackson-Bey*, 690 S.W.3d 181, 186 (Mo. banc 2024) (quotation omitted). The elements of a crime are found **only** in the statute creating that crime. § 556.026, RSMo 2016 ("No conduct constitutes an offense or infraction unless

6

made so by this code or by other applicable statute."). The reference to "common law" in *Jackson-Bey* was merely to judicial constructions given those statutory elements when necessary. *See State v. McTush*, 827 S.W.2d 184, 188 (Mo. banc 1992) (holding elements of an offense are "gleaned from the statutes or common law definitions"); *State v. Hines,* 377 S.W.3d 648, 655 (Mo. App. 2012) (holding "elements of an offense are derived from the statute establishing the offense or, when relevant, common law definitions" (quotation omitted)).

The standard of review for sufficiency claims has oft been repeated and remains unchanged. "In considering whether the evidence is sufficient to support the jury's verdict, we must look to the elements of the crime and consider each in turn." *State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993). "[T]he Court does not act as a 'super juror' with veto powers, but gives great deference to the trier of fact." *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc 1998) (citation omitted). Nor does this Court "weigh the evidence but rather accepts as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignores all contrary evidences and inferences." *State v. Gilmore*, 537 S.W.3d 342, 344 (Mo. banc 2018) (alterations and quotation omitted). In conducting such a review, however, this Court "may not supply missing evidence, or give the State the benefit of unreasonable, speculative or forced inferences." *Id*. (alterations and quotation omitted). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*State v. Tate*, 708 S.W.3d 483, 489 (Mo. banc 2025) (alteration in original) (quotation omitted).

**ANALYSIS**

### I.  Winter's Murder Conviction

Winter makes two arguments regarding the sufficiency of the evidence to support his first-degree murder conviction.  First, he claims there was insufficient evidence to prove the *corpus delicti*, i.e., that Victim was killed and his death was caused by the criminal agency of another.  Second, Winter argues, if Victim was murdered, there was insufficient evidence to prove the element of deliberation.  This Court rejects both arguments.

### A.  The *corpus delicti* doctrine has no application to Winter's case

Winter claims the state failed to prove the *corpus delicti* beyond a reasonable doubt.  The term "*corpus delicti*" is Latin for "body of the crime."  *Corpus Delecti*, *Black's Law Dictionary* (10th ed. 2014).  It refers to the basic facts demonstrating a crime has occurred.  For example, in a homicide case, the *corpus delicti* is: (1) the victim is dead; and (2) this death resulted from the criminal agency of some third party.  *State v. Edwards*, 116 S.W.3d 511, 544 (Mo. banc 2003).  Winter's claim fails, however, because the state is not obligated to prove the *corpus delicti* in every case and was not obligated to do so in this case.

"The term [*corpus delicti*] is used in the context of criminal law to describe the prosecutor's burden of proving that a crime was committed by someone, ***independent from a defendant's extrajudicial statements***."  *State v. Madorie*, 156 S.W.3d 351, 353

8

(Mo. banc 2005) (emphasis added) (quotation omitted); *see also* Thomas A. Mullen, *Rule Without Reason: Requiring Independent Proof of the Corpus Delicti as a Condition of Admitting an Extrajudicial Confession*, 27 U.S.F. L. Rev. 385, 387 (1993). *Corpus delicti* has nothing to do with the elements of a crime or the state's constitutional burden of proving those elements beyond a reasonable doubt. As noted above, the state's burden of proof beyond a reasonable doubt begins and ends with the statutory elements of the crime and applicable sentence.

The *corpus delicti* doctrine, on the other hand, is simply a rule of evidence. The state may not offer a defendant's extrajudicial inculpatory statement until evidence independent of that statement corroborates the *corpus delicti*, i.e., that a crime in fact occurred. *Madorie*, 156 S.W.3d at 353. *Madorie* traces the history of the doctrine, summarizing its application as follows:

> A [circuit] court has broad discretion to admit or exclude evidence at trial. This standard of review compels the reversal of a [circuit] court's ruling on the admission of evidence only if the court has clearly abused its discretion.
>
> Extrajudicial admissions or statements of the defendant are not admissible in the absence of independent proof of the commission of an offense, i.e. the corpus delicti. Evidence, however, that the defendant was the criminal agent is not required before the defendant's statement or confession is admitted. In addition, absolute proof independent of his statement or confession that a crime was committed is not required. All that is required is evidence of circumstances tending to prove the corpus delicti corresponding with the confession. *Slight corroborating facts* are sufficient to establish the corpus delicti. The determination of whether there is sufficient independent evidence of the corpus delicti of an offense is fact specific and requires a case-by-case evaluation. Under the facts of this case, the [circuit] court did not abuse its discretion in finding that the corpus delicti was proven and admitting Appellant's statements.

*Madorie*, 156 S.W.3d at 355 (emphasis in original) (citations and quotations omitted).

9

Accordingly, Winter's assertion the state was obligated to prove beyond a reasonable doubt the *corpus delicti* in his case is incorrect on two grounds. First, *corpus delicti* never needs to be proven beyond a reasonable doubt, only with slight corroborating facts. *Edwards*, 116 S.W.3d at 544. Second, it is an evidentiary doctrine only and does not apply where extrajudicial admissions are not at issue. *Madorie*, 156 S.W.3d at 355.

Winter did not object at trial that his many texts and other electronic messages could not be admitted without proof of the *corpus delicti*, nor does he argue on appeal that the circuit court erred in admitting this evidence without such a showing.[1] Instead, he seeks to convert this evidentiary rule into additional elements of the crime the state must prove beyond a reasonable doubt. This argument is rejected as clearly incorrect, and Winter's first point is denied.[2]

---

[1] Even if Winter had raised a *corpus delicti* objection to the state's use of his electronic messages, the evidence independent of those messages discussed below, including the bloody rope and gruesome state of the van, more than "slightly" corroborate that Victim had been killed by the criminal agency of another.

[2] In the end, it is not clear what Winter's claim would have profited him even if he had been correct. The *corpus delicti* normally is subsumed in the statutory elements such that proof of the latter necessarily proves the former. For example, proof Winter killed Victim, knowingly and after deliberation, necessarily proves Victim died and his death resulted from the criminal agency of another. As discussed below, there was sufficient evidence to prove the elements of first-degree murder beyond a reasonable doubt; therefore, there is no question but that the *corpus delicti* was shown. This is why the *corpus delicti* doctrine is confined to the very limited role of ensuring the state cannot rest its proof entirely on the defendant's extrajudicial admissions unless and until it shows with independent evidence some slight corroboration that a crime in fact occurred.

**B.    There was sufficient evidence for a reasonable juror to find Winter deliberated before murdering Victim**

In his second point, Winter argues there was insufficient evidence for a reasonable juror to find him guilty of first-degree murder and, in particular, that he murdered Victim after deliberation. As noted above, the only relevant question is whether the evidence – viewed in the light most favorable to the state – could persuade any reasonable juror beyond a reasonable doubt that Winter committed the statutory elements of first-degree murder. *Tate*, 708 S.W.3d at 489. The statute defining first-degree murder provides: "A person commits the offense of murder in the first degree if he or she knowingly causes the death of another person after deliberation upon the matter." §565.020.1, RSMo 2016. The elements, therefore, are "(1) knowingly (2) causing the death of another person (3) after deliberation upon the matter[.]" *State v. Tisius*, 92 S.W.3d 751, 764 (Mo. banc 2002).

Deliberation is the element that distinguishes first-degree murder from second-degree murder. *Id*. It is defined as "cool reflection for any length of time no matter how brief[.]" §565.002(5), RSMo Supp. 2017. "Deliberation is not a question of time – an instant is sufficient – and the reference to 'cool reflection' does not require that the defendant be detached or disinterested." *State v. Nathan*, 404 S.W.3d 253, 266 (Mo. banc 2013). "Deliberation includes a free act of the will done in furtherance of a formed design to gratify a feeling of revenge." *State v. Fielder*, 706 S.W.3d 303, 308 (Mo. App. 2025) (quotation omitted).

11

Deliberation, like any other element, can be proved by circumstantial evidence, i.e., evidence giving rise to a reasonable inference of guilt. *See State v. Lehman*, 617 S.W.2d 843, 847 (Mo. banc 2021) (holding "[c]ircumstantial rather than direct evidence of a fact is sufficient to support a verdict").

> Evidence of conduct that is relevant to the issue of deliberation in a first[-]degree murder case falls into a least four broad categories. First, there may be direct evidence that the defendant did or said certain things in advance of the act to facilitate the crime. This is "planning evidence." Second, there may be evidence of a pre-existing relationship between the victim and the defendant prior to the murder that provides a motive for the killing. This is "bad-blood evidence." Third, there may be no direct evidence of planning, but the complicated manner in which the defendant carried out the crime shows that the murder could not have been committed as a result of a spur-of-the-moment decision to act. This is "complicated-design evidence." Fourth, there may be evidence that the defendant failed to take action that a person who did not possess a guilty mind would be expected to take. Most often this conduct occurs after the crime is committed. This is "failure-to-act" evidence.

*State v. Roberts*, 948 S.W.2d 577, 589 (Mo. banc 1997). Evidence from all four of these categories, and others, is present in this case. When that evidence is viewed in the light most favorable to the state, it is sufficient for a reasonable jury to infer Winter deliberated before knowingly killing Victim.

Winter spent weeks planning and preparing to torture and then murder Victim. He rented a U-Haul van for this purpose. He explained his motive to K.P. and A.S., i.e., he believed Victim had robbed Winter and raped his girlfriend. Winter told A.S. he wanted him to help "f**k [Victim] up" and told his girlfriend, S.S., he would "make sure [Victim] suffers slowly with pain and agony." Winter told K.P. and A.S. they were to meet him at the Central Avenue house on July 26, and he would bring Victim there. He

12

reminded K.P. to bring zip ties and PVC pipe to use on Victim. All of this evidence supports a reasonable inference of deliberation.

On July 26, Winter carried out his plan. He invented a story to lure Victim into the van and delivered him to the Central Avenue house. Though there are gaps in the virtual play-by-play record of the events via electronic messages, the evidence is sufficient for a reasonable juror to infer Winter restrained, tortured, and then killed Victim over the next three hours or more. He deceived Victim into going with him to the Central Avenue house, where A.S. was to help make him "suffer." This, and the bloody rope later seen in the back of the van, support a reasonable inference that, when Winter drove away with Victim shortly before 11:30 p.m., Victim was both bound and injured.[3]

Winter then texted his girlfriend, S.S., whom he expected to join him, and told her he was on the highway. More than an hour went by, however, as Winter drove around waiting to hear from her. When she finally responded, telling Winter in no uncertain terms to stop what he was doing, Winter replied: "I'm out here driving circles waiting

---

[3] Despite Winter's reminder, K.P. did not bring the zip ties or the PVC pipe. This required Winter to improvise, using rope he either had with him or found at the Central Avenue house. The inference Victim was bound before Winter drove away with him in the back of the van is based in part on the text he sent his girlfriend, S.S., an hour later that Victim was "already f\*\*ked up." In that hour between leaving the house and sending this text, nothing suggests Winter took time to stop, beat Victim, and tie him up. Instead, the only reasonable inference is Victim was bound and injured before Winter left the Central Avenue house. This inference is strengthened by the fact Winter texted S.S. shortly after he left the house and told her he was on the highway. It is unreasonable to believe Winter was driving and texting for more than an hour, all the while being vulnerable to an attempted escape by an unrestrained Victim. Finally, the bloody rope strengthens the inference Victim was alive when he was put into the van. Had he already been dead, the rope would not have been necessary. And he remained alive long enough to produce the "horror film" amount of blood D.C. later saw.

for you. Dude's already f**ked up." This strongly suggests Victim was injured, but still alive. As a result, not only do the bloody rope and large amount of blood (like a "horror film") in the back of the van support the reasonable inference Victim was bound and injured when Winter drove away from Central Avenue with Victim, that evidence and the timing of the foregoing texts also supports the reasonable inference Victim remained alive and bound for at least an hour before dying. Yet, with all this time to abandon his nefarious plan and either help or seek help for Victim, Winter did nothing to help him. This failure supports an inference of deliberation. *See State v. Emery*, 701 S.W.3d 585, 596-97 (Mo. banc 2024) (holding evidence defendant chose not to deviate from the planned action and provide or seek aid for a victim who was injured but not yet dead supported an inference of deliberation); *State v. Cole*, 71 S.W.3d 163, 169 (Mo. banc 2002) (holding deliberation "may be inferred from the fact that a defendant had the opportunity to terminate an attack after it began").

Finally, Winter's actions after the murder also support a reasonable inference of deliberation prior to the murder. *See Tisius*, 92 S.W.3d at 764 (holding "conduct after the murders can also support a finding of deliberation"). He researched how to dispose of a body, he got T.C. and D.C. to help him (unsuccessfully) clean the blood out of the van while Winter burned the bloody ropes and a trash bag of other presumably incriminating material. Winter was in possession of (and asked T.C. to help him get rid of) Victim's temporary identification, ATM and EBT cards, and he led law enforcement officers on a high-speed chase when they tried to arrest him. Individually and collectively, this

14

evidence overwhelmingly supports a reasonable inference of deliberation. Winter's

second point is denied.[4]

## II. Winter's Kidnapping Conviction

In his third point, Winter argues there was insufficient evidence for a reasonable

jury to find him guilty of first-degree kidnapping. Again, the only relevant question is

whether the evidence – viewed in the light most favorable to the state – could persuade

any reasonable juror beyond a reasonable doubt that Winter committed the statutory

elements of first-degree kidnapping. *Tate*, 708 S.W.3d at 489. As relevant to this case,

section 565.110.1(4)-(5), RSMo 2016, defines first-degree kidnapping as follows:

> unlawfully confin[ing] another person without his or her consent for a
> substantial period, for the purpose of … (4) [f]acilitating the commission of
> any felony or flight thereafter; or (5) [i]nflicting physical injury on or
> terrorizing the victim or another.

In other words, the state had to prove beyond a reasonable doubt Winter committed the

following elements: (1) he unlawfully confined Victim; (2) without Victim's consent;

(3) for a substantial period; and (4) for the purpose of either (a) facilitating commission

of a felony or flight thereafter, or (b) inflicting physical injury or terrorizing Victim.

---

[4] Though Winter's claim is focused on whether the evidence was sufficient to prove deliberation beyond a reasonable doubt, his argument rests in part on his assertion there was insufficient evidence to prove Victim actually died because his body was never found. This argument fails, however, because there was sufficient evidence for a reasonable juror to conclude beyond a reasonable doubt that Victim died and Winter killed him. The evidence of planning beforehand and attempts at evasion afterward contribute to this inference, as does the bloody rope, the state of the van after the murder, and the fact Victim – who had regular interaction with family and others before July 26 – has not been seen or heard from since he left the Central Avenue house, bound and injured, in Winter's van on the evening of July 26, 2019.

15

Winter focuses his claim on the third element[5] and argues the state failed to adduce sufficient evidence from which a reasonable juror could find beyond a reasonable doubt that Winter confined Victim for a "substantial period." Winter argues the "substantial period" element requires proof the confinement was not "merely incidental" to some other charged crime. The state, on the other hand, argues this element merely requires confinement that exposed Victim to an "increased risk of danger or harm." Both are wrong.

Nothing in section 565.110.1(4)-(5) expressly requires the state to prove beyond a reasonable doubt the confinement was not "merely incidental" to some other charged crime **and/or** that the confinement "increased the risk of harm or danger" to the victim; nor can either (or both) of these would-be elements fairly be said to be implied by the plain and unambiguous statutory element that the confinement was for a "substantial period." Accordingly, because the state was under no burden to prove the confinement was not "merely incidental" to some other charged crime or that the confinement "increased the risk of harm or danger" to the victim, and because the evidence was more

---

[5] Evidence of the first, second and fourth elements was so overwhelming Winter invests little effort challenging it. As discussed above, there is no question the evidence was sufficient for the jury to find beyond a reasonable doubt Victim was bound and injured when Winter drove away from the Central Avenue house with Victim in the back of the van. Accordingly, a reasonable juror would have a sufficient basis from which to infer Winter unlawfully confined Victim without Victim's consent. Similarly, Winter's announced plan to assault Victim and make "sure he suffers slowly with pain and agony" was sufficient to prove Winter's confinement of Victim was for the purpose of facilitating Winter's assault of Victim and/or injuring or terrorizing Victim. As a result, Winter's claim in this Court focuses on the third element, i.e., that the confinement be for a "substantial period."

than sufficient for a reasonable juror to find beyond a reasonable doubt that Winter confined Victim for a "substantial period" as this plain and unambiguous phrase ordinarily is understood, Winter's third claim is rejected.

Both Winter and the state base their arguments on *State v. Sistrunk*, 414 S.W.3d 592 (Mo. App. 2013). This case erroneously includes in a sufficiency of the evidence analysis, either as part of or in addition to the plain and simple "substantial period" element, an obligation for the state to prove beyond a reasonable doubt the confinement was "more than incidental" to another charged crime and/or that it "increased risk of harm or danger to the victim." *Id*. at 600. *Sistrunk* correctly notes the legislature has not defined "substantial period" and "no Missouri court has expressly addressed the length of time a victim must be confined [] for there to be a submissible case of kidnapping pursuant to [s]ection 565.110." *Id*. (emphasis omitted).

Rather than confine the analysis to the plain language of the statute, however, and simply analyze whether a reasonable juror could conclude the confinement lasted for a "substantial period," *Sistrunk* erroneously concludes "the offense of kidnapping can only be sustained whe[n] the movement or confinement of the victim is more than 'merely incidental' to another offense." *Id*. *Sistrunk* then compounds this error by holding:

> Determining whether a defendant's movement or confinement of his victim is merely incidental to another offense or is sufficient to constitute the offense of kidnapping requires this Court to focus upon whether there was any increased risk of harm or danger to the victim from the movement or confinement that was not present as the result of the other offense.

*Id*. (quotation omitted). Neither of these requirements, however, has any foundation in the text of the statute.

17

*Sistrunk* was not the first to make these mistakes. It relies on *State v. Williams*, 860 S.W.2d 364, 365 (Mo. App. 1993), for both erroneous statements. *Williams*, in turn, relies on *State v. Jackson*, 703 S.W.2d 30 (Mo. App. 1985), and this is where the analytical train left the tracks. *Jackson* states:

> In determining whether a defendant's actions of moving and confining his victim are incidental to another offense or are sufficient by themselves to constitute the offense of kidnapping, we must look to see if there was any increased risk of harm or danger to the victim from the movement or confinement that was not present as a result of the other offense.

*Id*. at 33. But *Jackson* was **not** evaluating a sufficiency of the evidence claim. Instead, it was evaluating a claim that the "convictions for both rape and kidnapping constituted double jeopardy and subjected defendant to multiple punishment for merged offenses which is in violation of the Fifth and Fourteenth [a]mendments to the United States Constitution and Article I, § 18(a) of the Missouri Constitution." *Id*. at 32.

Because *Jackson* was evaluating a double jeopardy, multiple punishment claim, the analysis properly focuses on whether the legislature intended multiple punishments for the conduct at issue. *State v. Hollowell*, 643 S.W.3d 329, 342 (Mo. banc 2022). And, to that end, it is reasonable for *Jackson* to look to the Comment to the 1973 Proposed Code, which stated: "Kidnapping is not meant to cover the confinement or movement which is merely incidental to the commission of another offense .... To take such incidental confinement or movement and punish it as kidnapping would be ***making two crimes out of what is basically one offense***." *Jackson*, 703 S.W.2d at 32-33 (emphasis added) (quoting § 565.110, Comment to the 1973 Proposed Code); *see also State v. Tomlin*, 864 S.W.2d 364, 366-67 (Mo. App. 1993) (conducting a similar double jeopardy,

18

multiple punishments analysis). Accordingly, if a defendant claims a charge of first-degree kidnapping is so necessarily subsumed within another charge that punishments for both will violate double jeopardy, that defendant may well argue the legislature did not intend multiple punishments when the confinement conduct underlying the charge of kidnapping was merely incidental to the conduct underlying the other charge and did not expose the victim to any new or increased risk of harm or danger. This issue is not decided here, however, because – as in *Sistrunk* and *Williams* – that issue is not before the Court.

*Sistrunk* and *Williams* were not analyzing double jeopardy, multiple punishment claims, and Winter raises no such claim in this case. Instead, *Sistrunk*, *Williams* and the present case involve ***only*** sufficiency of the evidence claims. Accordingly, the analysis used in *Jackson* and *Tomlin* simply does not apply.

As set forth above, this Court reviews only "whether there is sufficient evidence to support the charged crime, based on the ***elements of the crime as set forth by statute*** and common law [constructions of those elements] and the evidence adduced at trial." *Jackson-Bey*, 690 S.W.3d at 186 (emphasis added) (quotation omitted). The elements of first-degree kidnapping are set forth in section 565.110.1, and these elements do not require the state to prove the confinement exposed the victim to "increased risk of harm or danger" or the confinement was not "merely incidental" to another charged crime. Instead, the relevant element in section 565.110.1 simply requires the state to prove the confinement was for a "substantial period." Because there is nothing ambiguous about this word or the phrase in which it is used, there is no excuse for importing the "merely

incidental" or "increased risk of harm" concepts under the guise of construction. *Smith v. St. Louis Cnty. Police*, 659 S.W.3d 895, 898 (Mo. banc 2023) ("If the intent of the legislature is clear and unambiguous, by giving the language used in the statute its plain and ordinary meaning, then [this Court is] bound by that intent and cannot resort to any statutory construction in interpreting the statute." (alteration in original) (quotation omitted)).

This is a textbook example of a common mistake, and an object lesson in the mischief that can ensue when lawyers and judges confuse construction and application. Construction may occur only when there is an ambiguity. *Id*. A statute is ambiguous – and, therefore, requires construction – only when there is an "uncertainty of meaning ***based not on the scope of a word or phrase*** but on a semantic dichotomy that gives rise to any of two or more quite different but almost equally plausible interpretations." *Ambiguity*, *Black's Law Dictionary* (10th ed. 2014) (emphasis added); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 425 (2012) (same); 2A *Sutherland Statutory Construction* §45.2 (7th ed.) ("[T]he inquiry, when evaluating whether a statute is ambiguous, is not whether the scope of a statute is ambiguous, but rather whether the statutory language itself is ambiguous.").

On the other hand, when the difficulty or uncertainty is based on the ***scope*** of the word rather than its meaning, this merely requires application, not construction. The criminal law is replete with words such as "substantial," "reasonable," and many others demanding much from judges and juries in terms of application. But such is the day-to-day work of circuit judges evaluating the submissibility of the state's cases and

20

jurors bearing the ultimate responsibility for applying such laws to the facts of each case. So long as there is no genuine debate as to the plain and ordinary ***meaning*** of a statutory word or phrase, difficulty in ***applying*** that word or phrase cannot justify grafting judicially constructed requirements onto that otherwise unambiguous statute.

The element that confinement in first-degree kidnapping must be for a "substantial period" is not ambiguous. "Substantial" means "not seeming or imaginary : not illusive," "being of moment : important, essential," and "considerable in amount." *Substantial*, *Webster's Third New International Dictionary* (1966); *Substantial, Black's Law Dictionary*, (10th ed. 2014) (same). Accordingly, the word "substantial" (and, therefore, the phrase "substantial period") has a plain, ordinary meaning easily understood by persons of ordinary intelligence. *See, e.g., State v. Mahurin*, 799 S.W.2d 840, 842 (Mo. banc 1990) (holding the "words 'substantial risk' have a plain and ordinary meaning cognizable by a person of ordinary intelligence").

Because the phrase "substantial period" is not ambiguous, courts have no authority to use that phrase as justification for requiring the state to prove elements that have no basis in the text of the statute, including elements that the confinement was more than "merely incidental" to another charged crime or that the confinement "increased risk of harm" to the victim. Accordingly, *Sistrunk*, *Williams*, and all similar cases requiring such proof in conducting sufficiency of the evidence reviews of first-degree kidnapping convictions are overruled.[6]

---

[6] Such overruled cases include, e.g., *State v. Sims*, 700 S.W.3d 569, 579 (Mo. App. 2024); *State v. Taylor*, 317 S.W.3d 89, 92-93 (Mo. App. 2010); *State v. Brock*, 113

21

Shorn of the distracting notions of "merely incidental" and "increased risk," Winter's third claim is reduced to the simple question of whether there was sufficient evidence for a reasonable juror to find beyond a reasonable doubt Winter confined Victim for a "substantial period." Plainly there was. As explained above, Winter left the Central Avenue house with Victim already bound (not to mentioned gravely injured). He drove "in circles" for more than an hour as he tried to reach his girlfriend. Somewhere in the ensuing hours, Winter killed Victim.

It does not matter precisely when the murder occurred and, therefore, when the confinement ended.[7] Winter's confinement of Victim started no later than 11:30 p.m., when he left the Central Avenue house, and continued at least through Winter's text exchanges with S.S. ending no earlier than 1:39 a.m. As previously explained, the

_____

S.W.3d 227, 231-32 (Mo. App. 2003); *State v. Shelton*, 78 S.W.3d 200, 204 (Mo. App. 2002); *State v. Lyles*, 996 S.W.2d 713, 716 (Mo. App. 1999).

[7] Winter takes issue with the circumstantial nature of the evidence against him and the fact there is no evidence of the exact time Victim was killed and, therefore, the exact length of his confinement. Winter's argument, however, ignores the standard of review and the fact that circumstantial evidence is sufficient to uphold a conviction. The standard of review when reviewing a sufficiency of the evidence claim requires this Court to view the evidence in the light most favorable to the verdict, and all contrary inferences must be ignored. "If that evidence supports equally valid inferences, it is up to the factfinder to determine which inference to believe, as the factfinder is permitted to draw such reasonable inferences from the evidence as the evidence will permit." *Lehman*, 617 S.W.3d at 847 (quotation omitted); *see also Grim*, 854 S.W.2d at 406 ("If a jury is convinced beyond a reasonable doubt, so long as the evidence meets the minimal appellate standard required by due process, we need not disturb the result simply because the case depended wholly, mostly, or partially upon circumstantial proof."). The Court does not hold the inferences on which the Court rejects each of Winter's first three claims are mandatory. The Court merely holds these inferences are reasonable and supported by the evidence. The responsibility for deciding whether to draw a reasonable inference that is supported by the evidence rests solely with the jury, and, here, the jury chose to do so.

22

bloody rope, the amount of blood in the van, and the timing and content of Winter's texts to and from S.S. support a reasonable inference that Victim was bound, but alive, this entire period and probably much longer before Winter stopped and killed him. Accordingly, there is no question the evidence was sufficient for a reasonable juror to find beyond a reasonable doubt Winter confined Victim illegally, without Victim's consent, for a "substantial period," and for both of the alternative purposes set forth in section 565.110.1(4)-(5). Winter's third claim is denied.

### III. Nunc Pro Tunc

In his final point, Winter argues, and the state agrees, the circuit court plainly erred because its written judgment differs materially from its oral pronouncement of sentences. At sentencing, the circuit court announced Winter would be sentenced to life without parole for the first-degree murder count, life with the possibility of parole for the first-degree kidnapping count, and the latter sentence was to be served consecutively to the former. The circuit court's written judgment, however, indicated Winter was sentenced to 999 days' imprisonment for each of the murder and kidnapping counts.

When there is a material difference between the written judgment and the oral pronouncement of sentence, the oral pronouncement controls. *State ex rel. Zinna v. Steele,* 301 S.W.3d 510, 514 (Mo. banc 2010), *overruled on other grounds by Branson v. Shewmaker*, 710 S.W.3d 531 (Mo. banc 2025). Accordingly, this Court remands the case to the circuit court solely for the purpose of the circuit court correcting *nunc pro tunc* the written judgment to conform with its oral pronouncement of consecutive life sentences

23

for the kidnapping and murder counts, with and without the possibility of parole respectively.

## CONCLUSION

For the reasons set forth above, the judgment of the circuit court is affirmed in part and vacated and remanded in part for the limited purpose of the circuit court correcting *nunc pro tunc* its written judgment to reflect its oral pronouncement of sentences made on January 20, 2023.

_____
Paul C. Wilson, Judge

All concur.